**SAFEWAY TRAILS, INC., et al.,**
**Plaintiffs,**

v.

The **STUYVESANT INSURANCE COMPANY, Equity General Insurance Company, et al., Defendants.**

No. C–150–G–61.

United States District Court
M. D. North Carolina,
Greensboro Division.

June 27, 1962.

Richard L. Wharton, Greensboro, N. C., and Charles B. McInnis and Richard R. Paradise, Washington, D. C., for plaintiffs.

Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for defendants.

PREYER, District Judge.

The plaintiffs have filed suit for Declaratory Judgment and seek an adjudication of their rights in the policies of public liability insurance concerning 1) whether the plaintiffs and other members of the class are entitled to payment under certain agreements reinsuring plaintiffs' policies of public liability insurance, and 2) whether the plaintiffs are entitled to call upon the defendant reinsurers to undertake the defense and adjustment of existing claims and suits under the plaintiffs' policies of public liability insurance.

Plaintiffs, none of whom are residents of North Carolina, are business organizations (bus companies and truck lines), which purchased policies of liability insurance issued by Equity General Insurance Company (hereinafter called Equity General), a Florida corporation, through the T. B. Jones Insurance Service, Inc., Burlington, North Carolina, or Seaboard Underwriters, Inc., a subsidiary of Jones. Equity General was reinsured for certain percentages of the losses it might sustain on the policies issued to the plaintiffs with five companies ("quota share" agreements). Equity General was also reinsured by one company (Stuyvesant) for losses sustained by it (Equity General) in excess of $25,000.00 ("excess agreement"). All of these reinsuring companies are named as defendants in this action. All of these Reinsurance Agreements were negotiated, signed, and delivered outside the State of North Carolina. The Reinsurance Agreements were between Equity General and the reinsuring companies, and the plaintiffs were not parties to the agreements.

Thereafter, Equity General became insolvent, and in Florida, the state of its incorporation, a receiver was appointed by the Florida Court having jurisdiction. The receiver was directed to take possession of all of the assets of Equity General. Defendant reinsurers have been ordered by the Florida Court to make payments to the Florida receiver under the Reinsurance Agreements, which provide for payment to the receiver in the event of insolvency by Equity General.

Plaintiffs, who contend that since the insolvency of Equity General they have been forced to defend lawsuits and pay claims against them, have declined to present to the Florida receiver their claims under the policies issued by Equity General.

The plaintiffs have brought this suit seeking to have this Court declare that they may recover on the Reinsurance Agreements directly against the reinsurers. In so far as the motions now before this Court are concerned, the basic positions of the defendant rein-·

surers herein are that as to three of them they are not subject to service of process in North Carolina, and that as to all of the defendants the action should be dismissed because this Court does not have jurisdiction over the subject matter, such jurisdiction being in the Florida Court.

None of the parties to this suit are residents of the State of North Carolina, except the defendant Charles F. Gold, as Ancillary Receiver for the State of North Carolina of Equity General Insurance Company. Two of the plaintiffs are licensed to do business in North Carolina.

The defendants, The Unity Fire and General Insurance Company (Unity), United States Liability Insurance Company (United States Liability), and Global Reinsurance Company (Global) are not licensed or authorized to do business in North Carolina, and had no agents and no offices or property therein.

The three other defendants The Stuyvesant Insurance Company (Stuyvesant), Preferred Insurance Company (Preferred), and Nationwide Mutual Insurance Company (Nationwide) are all licensed and authorized to do business in the State of North Carolina.

The plaintiffs have attempted to obtain service of process on all of the defendant reinsurers under the provisions of the General Statutes of North Carolina, G.S. § 58–153.1, the "Unauthorized Insurers Process Act." Since Stuyvesant, Preferred and Nationwide are licensed and authorized to do business in North Carolina, those reinsurers do not contest the service of process. However, it is contended that the defendants Unity, United States Liability and Global are not sub-

ject to service of process in the State of North Carolina.

In addition, all of the defendant reinsurers move to dismiss this suit on the ground that this Court does not have jurisdiction over the subject matter of the action.

The Reinsurance Agreements (Treaties) between the reinsurers and Equity General involved in this litigation were negotiated in the State of New York through a reinsurance broker, Home and Overseas Offices, Ltd. of New York City.

All of the Reinsurance Agreements provide that they reinsure the original policies of Equity General written through T. B. Jones Insurance Service, Inc. of Burlington, North Carolina, or Jones' subsidiaries.

Jones sold policies of public liability insurance of Equity General to the plaintiffs and to others throughout the eastern part of the United States, collected the premiums, and transmitted the premiums to Equity General. Equity General then paid premiums as provided for in the Reinsurance Agreements to Home and Overseas in New York. Home and Overseas delivered the reinsurance premiums to the reinsurers from its offices in New York. However, Equity General did not pay a substantial amount of reinsurance premiums due the reinsurers.

## JURISDICTION OF THE PERSON

Service of process was attempted in this action on defendants Unity, United States Liability, and Global by virtue of G.S. § 58–153.1, of the North Carolina "Unauthorized Insurers Process Act."[1]

1. The North Carolina Commissioners of Insurance stated that the purported service was pursuant to G.S. § 58–153. The pleadings (amendment to the Complaint, Act IX), and responses to the motions to dismiss of defendants Unity, United States Liability and Global indicate that plaintiffs have attempted service under G.S. § 58–153. Plaintiffs in their brief, however, argue that service is also good under G.S. § 58–164(e) (1), a section

of the "Uniform Unauthorized Insurers Act," which provides:

"The transacting of business in this State by a foreign or alien insurer without a license and the issuance or delivery by such foreign or alien insurer of a policy or contract of insurance to a citizen of this State or to a resident thereof, or to a corporation authorized to do business therein, is equivalent to an appointment by such insurer of the Commissioner

The pertinent provisions of G.S. § 58–153.1 are as follows:

> *"Unauthorized Insurers Process Act.* —(a) Purpose of Section.—The purpose of this section is to subject certain insurers to the jurisdiction of courts of this State in suits by or on behalf of *insureds or beneficiaries* under insurance contracts. The General Assembly declares that it is a subject of concern that many *residents* of this State *hold policies of insurance issued by insurers* not authorized to do business in this State, thus presenting to such *residents* the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies. In furtherance of such State interest, the General Assembly herein provides a method of substituted service of process upon such insurers and declares that in so doing it exercises its power to *protect its residents* and to define, for the purpose of this statute, what constitutes doing business in this State, and also exercises powers and privileges available to the State by virtue of Public Law 15, 79th Congress of the United States, chapter 20, 1st Session, s. 340, as amended, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states.

> "(b) Service of Process upon Unauthorized Insurer.

> "(1) Any of the following acts in this State, effected by mail or otherwise, by an unauthorized foreign or alien insurer:

>> "(a) The issuance or delivery of contracts of insurance to residents of this State or to corporations authorized to do business therein,

>> "(b) The solicitation of applications for such contracts,

>> "(c) The collection of premiums, membership fees, assessments or other considerations for such contracts, or

>> "(d) Any other transaction of business,

> is equivalent to and shall constitute an appointment by such insurer of the Commissioner of Insurance and his successor or successors in office, to be its true and lawful attorney, upon whom may be served all lawful process in any action, suit, or proceeding instituted by or on behalf of an insured or beneficiary arising out of any such contract of insurance, and any such act shall be signification of its agreement that such service of process is of the same legal force and validity as personal service of process in this State upon such insurer." (Emphasis added.)

■■ We think the plain language of the statute—note especially the italicized words and phrases—manifests that the primary purpose of the statute is to protect residents of this State, and to prevent the necessity of North Carolina residents from resorting to distant forums to assert rights under insurance policies. Here, none of the plaintiffs are

---

and his successor or successors in office, to be its true and lawful attorney, upon whom may be served all lawful process in any action, suit or proceeding arising out of such policy or contract of insurance, and the said issuance or delivery is a signification of its agreement that any such service of process is of the same legal force and validity as personal service of process in this State upon it." We think any attempted service under G.S. § 58–164(e) (1) is ineffective be-

cause: 1) it is no longer in effect and has been superseded by G.S. § 58–153.1; 2) G.S. § 58–164 applies only to fire insurance, (it is a part of Article 18 "Sub-chapter 111, Fire Insurance"); 3) the requirements that a foreign insurer to be subject thereto must a) be transacting business in North Carolina, and b) have issued or delivered a policy to a resident of North Carolina are not met in this case.

residents of North Carolina[2] and are not entitled to take advantage of the statute. Although the point has not been before a North Carolina court, an almost identical New York statute has been construed to be for the protection only of New York residents in suits based on policies delivered to them in New York. Clifton Products, Inc., v. American Universal Insurance Co., 169 F.Supp. 842 (S.D.N.Y.1959).

Plaintiffs point to a North Carolina decision, Suits v. Old Equity Life Ins. Co., 241 N.C. 483, 85 S.E.2d 602 (1955), which involved service under G.S. § 58–164(e) (1) (See footnote 1). This decision was prior to the enactment of G.S. § 58–153.1 and the present case. In Suits, plaintiff was a citizen and resident of North Carolina and was solicited through the mails at his home in North Carolina, and Suits paid the premiums by mailing them to the office of the foreign insurer. Other acts were done by the insurer in North Carolina. The Supreme Court of North Carolina held that the foreign insurer was transacting business within this State. The case is distinguishable, not only because Suits was a resident of North Carolina and paid his premiums from North Carolina, but because the defendant insurer was not a reinsurer. While the defendant Old Equity Life Insurance Company, is sometimes referred to as a "reinsurer" and the agreement designated as a "reinsurance agreement," Old Equity Life Insurance Company was in fact simply a successor to an earlier company known as Old Equity Insurance Company. The offices of both companies were the same. Old Equity Insurance Company was an assessment company and turned over all of its assets and liabilities to Old Equity Life Insurance Company, a stock company. The agreement was in no sense a reinsurance agreement such as is involved in this litigation. As in most of the "direct" suit cases cited by plaintiffs, in Suits the "reinsurer" had taken over the insurer and was a successor to the insurer.

Plaintiffs seek to avoid the difficulty of their non-residency by arguing that this is a class suit involving 226 insureds of which 82 are North Carolina insureds represented by it. But none of these alleged North Carolina insureds is a party to this action. Also, there is no evidence that any one of the North Carolina insureds has a claim with the exception of the firm known as Johnson Brothers Truckers, Inc., of Elkin, North Carolina, which firm has filed its claim with the Florida receiver. But even assuming there are additional North Carolina insureds who would have claims, we think that if this is a class action at all, it is only a spurious class action, and therefore is binding only on the present plaintiffs. 3 Moore's Federal Practice § 23. Under plaintiffs' theory of the case, any one of them could have sued the defendant reinsurers. Each had a separate and individual policy issued by Equity General. Plaintiffs are seeking judgments against the reinsurers for the amount of their individual claims. This is not "a suit wherein, but for the class action device, the joinder of all interested persons would be essential." Tunstall v. Brotherhood of Locomotive F & E, 148 F.2d 403 (4th Cir., 1945). Rather, it is a case where "The right or liability of each is distinct. The class is formed solely by the presence of a common question of law or fact. When a suit is brought by or against such a class, it is merely an invitation to joinder —an invitation to become a fellow traveler in the litigation, which may or may not be accepted." 3 Moore's Federal Practice § 23.10. Any judgment, therefore, which might be entered would be

2. Two of the plaintiffs are licensed to do business in North Carolina. We understand from the plaintiff's brief that they concede that these two plaintiffs are not citizens and residents of North Carolina.

In any event, being licensed to do business in North Carolina would not make these two defendants residents of North Carolina. Ward v. Southern Sand & Gravel Co., 33 F.2d 773 (M.D., N.C., 1929).

building only upon the Equity General insureds actually before this court. 3 Moore's Federal Practice § 23.11(3). The fact that there may be North Carolina insureds who have claims but who are not parties does not help in conferring jurisdiction.

Not only, therefore, are plaintiffs not "residents" within the meaning of G.S. § 58–153.1; we also think the statute is inapplicable, even if the plaintiffs were residents, because the plaintiffs are not "insureds or beneficiaries" within the meaning of the statute. The Fourth Circuit has plainly held, on a factual situation which we think sufficiently similar, that no action will lie between an original policyholder of insurance and the company reinsuring that policy on behalf of the company issuing, and that the proceeds of such reinsurance contracts are assets to be distributed among general creditors where the company issuing the original policy is insolvent. United States to the Use of Colonial Brick Corp. v. Federal Surety Co., 72 F.2d 964 (4th Cir., 1934), cert. den. 294 U.S. 711, 55 S.Ct. 507, 79 L.Ed. 1245 (1935). We think it clear that "an ordinary contract of reinsurance, in the absence of provisions to the contrary, operates solely as between the reinsurer and the reinsured. It create[d] no privity between the original insured and the reinsurer. The contract of insurance and the contract of reinsurance are totally distinct and unconnected. An ordinary contract of reinsurance is one of indemnity against loss." O'Hare v. Pursell, 329 S.W.2d 614 (Mo.1959). Plaintiffs argue that the quota share agreements in question here are different from the ordinary reinsurance agreement and perform a different function from simply insuring the reinsured. We find no warrant for this contention in the cases. While it may be true that few reinsurance agreements are exactly alike, the "quota share" agreements in question appear to be conventional reinsurance agreements and contracts of indemnity between two insurance companies by which the ceding company is entitled to recoup from its reinsurer an agreed per cent of the losses it suffers under the covered policies. We fail to see how the express language of the quota share agreements makes the defendants direct participants in each policy of liability insurance issued by the Jones' Agencies to plaintiffs, as plaintiffs contend. The reinsurance agreements were contracts solely between Equity General and the reinsurer. The Jones' agencies had no relation to them. The Jones' agency agreement was between Jones and Equity General. The Jones' agencies collected premiums solely for Equity General and not for the defendant reinsurers. Under the terms of the Reinsurance agreements, Equity General was obligated to pay reinsurance premiums to the defendant reinsurers. In this connection, we point out that it is the terms of the Reinsurance Agreements that control. Plaintiffs contend that they were advised by Jones that the Reinsurance Agreements "had been developed and existed exclusively for the benefit of the plaintiffs," and that they are therefore third party beneficiaries. But the Jones' agencies were not the agents of the reinsurers and had no authority to speak for them. Plaintiffs are not third party beneficiaries because under the terms of the Reinsurance Agreements, the promise of the reinsurers is to pay Equity General, and not Equity General's insureds. Melco System v. Receivers of Trans-America Ins. Co., 268 Ala. 152, 105 So.2d 43 (Ala. 1958)

In addition, the insolvency clauses in the reinsurance agreements make it clear that the plaintiffs are not "beneficiaries." The insolvency clause in the "quota share" Reinsurance agreements provides:

"It is further agreed and understood that in the event of the insolvency of the Ceding Company, the reinsurance under this Agreement shall be payable by the reinsurers to the Ceding Company or its liquidator, receiver, or statutory successor,

except as provided in Section 315 of the New York Insurance Law." [3]

The insolvency clause in the "excess" reinsurance agreement between Equity General and Stuyvesant provides:

"It is further agreed and understood that the reinsurance shall be payable by the reinsurers directly to the company or to its liquidator, receiver, or statutory successor."

The insolvency clauses are clearly for the protection of the reinsured, Equity General, and not for the policyholders.

We find, therefore, that the purpose of the statute is to protect residents of this State who are insureds or beneficiaries of insurance contracts. We find that plaintiffs are neither "residents" nor "insureds or beneficiaries" within the meaning of G.S. § 58–153.1, that this statute is not intended to cover such a situation as is present here and is inapplicable, and that, therefore, service of process attempted under this statute on defendants Unity, United States Liability, and Global is ineffectual and invalid.

■ Since we find that the statute does not apply, it is unnecessary to consider whether any of the requirements of subsection (b) (1) of the statute are met. We point out, however, that in our opinion none of the requirements are met. The reinsurance agreements were not issued or delivered in North Carolina, and there was no solicitation by the reinsurers in North Carolina. The agreements were negotiated in New York and executed in states other than North Carolina. No premiums were collected in North Carolina pursuant to G.S. § 58–153.1(b) (1) (c). The reinsurance premiums were paid to the reinsurers from the offices of Home and Overseas in New York. Nor does the suit arise out of any transaction of business in North Carolina, under G.S. § 58–153.1(b) (1) (d).

The defendant reinsurers conducted no activities in this state with respect to the agreements. "By the weight of authority, the negotiation and execution outside the state, of a contract of reinsurance, is not doing business in the state where the insured property is situated and original risk was assumed." 2 Couch, Cyclopedia of Insurance Law, 524 (2d Ed., 1959).

Plaintiffs would contend that the above discussion is unduly technical and conceptualistic and disregards the economic realities of the insurance business. Their position is that Unity, Global and United States Liability issued an agreement of quota share insurance to Equity General, corporation authorized to do business in North Carolina, and were actual participating insurers in 226 policies of liability insurance issued and delivered in North Carolina to resident insureds of North Carolina; defendants collected very substantial premiums derived from insurance written in North Carolina; claims services were performed in North Carolina for the benefit of both Equity General and the defendants; underwriting services were performed in North Carolina on behalf of Equity General and defendants; and correspondence to and on behalf of and by defendants flowed in and out of North Carolina. Plaintiffs, they contend, were either direct insureds or third party beneficiaries under the quota share agreements. Plaintiffs argue that defendants were transacting business in North Carolina through the acts of Home and Overseas and through the acts of the Jones' agencies, which solicited the sale of the liability insurance policies to plaintiffs and collected the premiums and adjusted claims in North Carolina, which constituted Jones the agent in fact for the defendants as well as the agent for Equity General. The Jones' agencies were managing general agents for Equity General who

3. Plaintiffs contend that section 315 of the New York Insurance Law, McKinney's Consol.Laws, c. 28, entitles them to sue the quota share reinsurers directly. But section 315 provides that the sec-

tion applies only to fidelity and surety risks. The testimony of plaintiffs' witness, Woolaston, supports this. He further testified that these reinsurance clauses were of a "boiler plate nature."

performed a great deal of the work normally handled by the insurance company —the arrangement, plaintiffs argue, was "unique" in that Jones was to handle sales, underwriting, claims and other details for Equity General in North Carolina. Equity General's place in the arrangement was solely as a policy issuing company, of value mainly because it was licensed to do business in most states. Equity General's maximum liability was limited to $10,000, and in actuality the arrangement was conditioned upon, and depended upon, the obtaining of suitable reinsurance. Since defendants entered into the reinsurance agreements with the knowledge that the Jones' agencies would be writing policies for amounts of coverage up to $500,000, and that Jones only had authority to commit Equity General to a maximum liability of $10,-000 on any one loss, the defendants' participation constituted an indispensable element in the underwriting transactions of the Jones' agencies. The offices of the Jones' agencies made representation to the plaintiffs concerning the participation by the defendant reinsurers, and plaintiffs took out liability insurance policies on the strength of these representations. The arrangement, they contend, must be viewed as a whole and should not be legally compartmentalized. Not only do they urge that Home and Overseas and the Jones agencies were both agents of the defendants by reason of these inextricable relationships, they also argue that the facts show that defendants were engaged in a joint venture, the acts performed by the Jones' agencies in North Carolina must be deemed to have been performed for each of the defendants.

This argument is not without force but goes beyond the present state of the law. We view—as we must under the law—Home and Overseas as an intermediary or broker, and one which did not in any event transact any business in North Carolina. The Jones' agencies, as mentioned above, were agents solely for Equity General and never issued or sold any policy of insurance of the defendant reinsurers. As to the joint venture contention, the Court of Appeals for the Fourth Circuit has rejected this argument. United States to the Use of Colonial Brick Corp. v. Federal Surety Co., supra. See also Employers Reinsurance Corp. v. American Fidelity and Casualty Co., 196 F.Supp. 553 (W.D.Mo. 1959).

Plaintiffs argue that public policy requires a broad interpretation of G.S. § 58–153.1. But the statutes allowing the substitute service of service of process are basically fictions—the states are permitted these statutes for the purpose of protecting their residents, and because they are not unfair where a foreign defendant committed some act in a state which affected a state resident. But such a substitute service statute would be inequitable where a non-resident seeks to take advantage of it to sue on a foreign cause of action unrelated to the State. Under such circumstances, a showing of substantial business activity in the State by the defendants would be required. In fact, unless such statutes are construed to make these requirements there is considerable doubt of their constitutionality.

In International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court declared that a State may exercise personal jurisdiction of a foreign corporation when the corporation has "certain minimum contracts with it such that the maintenance of the suit does not offend the 'traditional notions of fair play and substantial justice.'" Some Courts have interpreted the latter element of the formula as essentially the equivalent of a doctrine of inconvenient forum. Latimer v. S/A Industries Reunidas F. Matarazzo, 175 F.2d 184 (2d Cir.) (L. Hand, J.), cert. denied, 338 U.S. 867, 70 S.Ct. 141, 94 L.Ed. 531 (1949); Travelers Health Association v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950) (Justice Black). "Such factors as the declining importance of territorial notions of State sov-

ereignty and the emergence of a unified national economy with rapid facilities of transportation and communication have led some courts to treat the whole formula as involving only a balancing of the particular interest involved in each case in an attempt to do 'substantial justice.' " 75 Harvard Law Review 1432. But the theory of Judge Hand and Justice Black was rejected by the Supreme Court in Hanson v. Denckla, 357 U.S. 235, 254, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), saying that a court does not acquire jurisdiction of a party by being the most conveniently located for litigation. Hanson reiterated that "however minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with the State that are a prerequisite to its exercise of power over him."

Plaintiffs argue that insurance law has not kept pace with modern times, that it is moribund, and that the only advance in the last fifty years in this field of the law has been in the "mail order" insurance cases. See McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 223 (1957). The states, they contend, have failed to recognize the economic realities of reinsurance. Reinsurance has become common-place and is as of much concern to states as "mail order" insurance. There may be merit to these contentions, but we think the time-honored answer—that this is a matter for legislation—is also the correct answer here, rather than construing private agreements to mean something they don't say. There is also a policy interest in predictability in the law, so that it may afford a guide to conduct. A few hard cases can be tolerated to effect this purpose. A "balancing of interests" or "substantial justice" approach in this area, under the guise of searching out the "economic realities," would inevitably be too vague.

The action is dismissed as to the defendants Unity, United States Liability, and Global for lack of jurisdiction of the parties.

## JURISDICTION OVER THE SUBJECT MATTER

■ Three of the defendant reinsurers (Stuyvesant, Preferred, and Nationwide) are subject to the jurisdiction of this Court by reason of the fact that they are licensed to do business in North Carolina. As to these three defendants —and as to all of the defendants—defendants ask that the action be dismissed for that this court lacks jurisdiction over the subject matter, such jurisdiction allegedly being in the Florida Court.

After Equity General became insolvent, Judge Hugh M. Taylor, of the Circuit Court of the Second Judicial Circuit, Leon County, Florida, entered an Order on September 23, 1960, appointing S. Edwin Larson receiver of all the assets of Equity General. On June 6, 1961, Judge Taylor entered an Order directing the receiver to marshal all of the assets of Equity General and authorizing the liquidation of the company. Among other things, Judge Taylor's Order of June 6, 1961, directed that all persons having claims against Equity General present the claims to the receiver not later than December 15, 1961.

The plaintiffs in this action, along with the defendant reinsurers, were notified that a hearing would be held in the State of Florida before Judge Taylor concerning the receiver's Application for Instructions, which raised, among others, questions as to the payment or payments of the reinsurance under the Reinsurance Agreements between the defendant reinsurers and Equity General. On October 27, 1961, a hearing was held before Judge Taylor in Florida, and the defendant reinsurers appeared through their counsel and submitted to the jurisdiction of the Florida Court. Actually, Unity and Global were the only reinsurers not already under the jurisdiction of the Florida Court as the others were already licensed and authorized to do business in Florida. All of the plaintiffs named in the complaint in this suit appeared specially at the Florida hearing and objected to the Florida Court exercising jurisdiction as to them as parties and objected

to the Court considering the receiver's petition for instructions with respect to the disposition of the funds under the Reinsurance Agreements.

Judge Taylor was advised of this suit here in the Middle District of North Carolina. On December 1, 1961, Judge Taylor entered an Order directing that the receiver collect from and that the re-insurers pay to the receiver the several sums of money from time to time to be found to be due by the reinsurers under the terms of the various Reinsurance Agreements. The Order also provides that in collecting such funds, the receiver is to allow an offset of premiums found to be due by Equity General to the rein-surers. In that connection, Equity General owes to the reinsurers substantial sums for premiums arising out of trans-actions under the Reinsurance Agree-ments.

In Judge Taylor's Order of December 1, 1961, he provided that a hearing would be held for the purpose of trying the issues as to whether the funds collected or to be collected by the receiver from the reinsurers are subject to priorities or special equities in favor of any in-dividual policyholders or class of policy-holders of Equity General or whether such funds should be made a part of the general assets of the receivership.

All of the defendant reinsurers are ready and willing to pay to the Florida receiver in accordance with the terms, provisions and limitations of the Rein-surance Agreements and in accordance with the Orders of the Florida Court.

Defendants contend that plaintiffs are seeking to recover here the same thing over which the Florida Court already has jurisdiction. They argue that where "a state court first acquires control of the *res*,[4] the federal courts are disabled from exercising any power over it, by injunction or otherwise." Toucey v. New York Life Ins. Co., 314 U.S. 118, 136, 62 S.Ct. 139, 86 L.Ed. 100 (1941). We think defendants' position is well-taken.

State courts are as equally free as federal courts from interference with property in their possession. The Su-preme Court has consistently upheld state court receiverships first assuming juris-diction. Porter v. Sabin, 149 U.S. 473, 13 S.Ct. 1008, 37 L.Ed. 815 (1892); Penn General Casualty Co. v. Pennsylvania, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850 (1934); Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1938).

The Fourth Circuit has held that pro-ceeds of reinsurance are assets of the insolvent reinsured company. United States to the Use of Colonial Brick Corp. v. Federal Surety, supra. We think the fact that the proceeds have not yet been paid into the Florida Court by the defendants is immaterial on the ques-tion of whether those proceeds are an asset of the insolvent estate under the jurisdiction of the Florida Court so that a cause of action involving them cannot be maintained elsewhere. "The prin-ciple applicable to both federal and state courts that the court first assuming ju-risdiction over property may maintain and exercise that jurisdiction to the ex-clusion of the other, is not restricted to cases where property has been actually seized under judicial process before a second suit is instituted, but applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property. The doctrine is necessary to the harmonious coöperation of federal and state tri-bunals." Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285, 291. See also Genecov v. Wine, 8 Cir., 109 F.2d 265.

---

**4.** We think that constructive possession of the res—the cause of action—was fixed in the Florida Court as soon as the receiver was appointed, and that it is therefore immaterial that the present suit was started before Unity and Global were be-fore the Florida Court.

In the present case, plaintiffs are seeking to have the reinsurance proceeds paid directly to plaintiffs rather than through the receiver. This is not a situation where plaintiffs are seeking to establish the *extent* to which they are entitled to share in the Florida receiver's fund. If so, this Court might have jurisdiction over the subject matter. Rather, plaintiffs are seeking to have assets taken from the hands of the Florida receiver. For this Court to take jurisdiction under such circumstances would prevent the litigation from following an orderly course.

The cases cited by plaintiffs deal with questions involving disputes as to the quantum of the res in the hands of the receiver. The federal suit in such a situation yields a result that is res judicata before the receiver and does not upset the orderly administration of the estate. The plaintiff is merely presenting his judgment to the receiver for payment. In the present suit, a judgment would not be binding on the Florida receiver since this court has no jurisdiction over him. Plaintiffs here are seeking to take the res totally from the Florida receiver. This the cases do not support.

Plaintiffs argue that they are not seeking to recover on the receiver's claim against the defendants but on their own claim based on their contractual relation with defendants. As we understand plaintiffs' position, they contend that they are not interfering with the receiver but only taking a position inconsistent with him; the receiver has his own claim against defendants while plaintiffs have theirs. This argument would result in double liability on the part of the defendants. Aside from that, we do not think this is the type of case justifying concurrent jurisdiction.

Plaintiffs also argue that a "controversy is not a thing", a res. They contend that the receiver cannot have jurisdiction over any proceeds from the reinsurance agreement until he has actual dominion, control, and physical power over it, relying particularly on Hanson

v. Denckla, supra, and Fischer v. The American United Life Ins. Co. et al., 314 U.S. 549, 62 S.Ct. 380, 86 L.Ed. 444 (1942). In Hanson, a testatrix who had been a domiciliary of Florida at the time of her death, had, before becoming a domiciliary of Florida, executed a trust instrument in Delaware and later executed in Florida a will and a power of appointment of the trust assets. Following her death, an action for a declaratory judgment concerning the residuary clause of her will was had in the Circuit Court for Palm Beach County, Florida. The United States Supreme Court held that the Florida Courts lacked jurisdiction *in rem* over the action involving the trust since the trust situs was in Delaware.

In Hanson, it was clear that the Delaware Court had jurisdiction to determine the validity of the disposition. The trust assets were held in Delaware, and the trust was administered there by a Delaware trust company. Although the Delaware court did not have jurisdiction over all of the claimants, it had jurisdiction over the property and could determine who was entitled to the property. There is no such connection with North Carolina in the present case—the trust res found in Delaware is considerably different from the cause of action we have here. Further, Professor Austin Scott, commenting on Hanson in 72 Harvard Law Review at p. 707, states that "the Florida court, even if it had jurisdiction over some of the beneficiaries, would have been wise to refrain from attempting to exercise jurisdiction. The Delaware court alone, having jurisdiction over the trustee, the trust assets, and the administration of the trust, could effectively determine the disposition of the trust assets * * * The attempt by the Florida court to exercise jurisdiction over some of the beneficiaries would not perhaps result in chaos, but it would prevent the orderly administration of the trust." We think his observation pertinent to this case.

Fischer was also a case in which the court claiming jurisdiction against a

receiver in another state was in actual possession of the securities in question.

We hold that this court lacks jurisdiction over the subject matter and that the action should therefore be dismissed.

Defendants are asked to prepare an order in accordance with the above.