741 So.2d 676 (1999)
Douglas Graham DONALDSON, et al., Plaintiffs-Appellants,
v.
UNITED COMMUNITY INSURANCE COMPANY, et al., Defendants-Appellees/Appellants.
No. 98-1187.
Court of Appeal of Louisiana, Third Circuit.
February 10, 1999.
Writ Denied May 7, 1999.
*677 Steven William Hale, Lake Charles, for Douglas Graham Donaldson, Jr. et al.
John Stanton Bradford, Paul Leonard Veazey, Jr., Lake Charles, John E.W. Baay, II, New Orleans, for Calcasieu Parish School Bd.
Robert E. Winn, New Orleans, for Reliance Ins. Co.
Edgar Dean Gankendorff, Lafayette, Scott Lassetter, Houston, TX, John Strausburger, Austin Tighe, Austin, TX, for General Motors Corp.
William A. Porteous, III, New Orleans, for Trenwick American Reinsurance Co., et al.
Christopher Paul Ieyoub, Lake Charles, for State Farm Mut. Auto. Ins. Co.
Mesonie Terrence Halley, Jr., Lake Charles, for La. Guaranty Ass'n.
Debra J. Hall, Anthony J. Mormino, Washington, DC, for Reinsurance Assoc. of America.
BEFORE: COOKS, SAUNDERS, and GREMILLION, Judges.
COOKS, Judge.
The Donaldsons and the Calcasieu Parish School Board, as third party plaintiffs, appeal the trial court's judgment sustaining peremptory exceptions of no right of action and granting summary judgment in favor of Reliance Insurance Company, Trenwick America Reinsurance Corporation, American Reinsurance Corporation and SCOR Reinsurance Company. For reasons which follow, the judgment of the trial court is affirmed.

BACKGROUND FACTS AND PROCEDURAL HISTORY
On January 14, 1993, Mr. Donaldson and his daughter, Marlon, were involved in an automobile accident. Their car was struck from the rear by a school bus driven by Helen H. Nash, an employee of the Calcasieu Parish School Board. The bus is owned by the School Board and insured by the United Community Insurance Company ("UCIC").
The Donaldsons filed suit against Nash, the School Board, and UCIC, claiming personal injury and loss of consortium, services and society. On February 16, 1994, the defendants answered, denying liability.
On November 9, 1995, before any judgment or settlement in this matter, the Insurance Commissioner of the State of New York declared UCIC insolvent and *678 entered a notice of liquidation. All proceedings against UCIC were suspended. Thereafter, the Donaldsons filed a first supplemental and amending petition substituting the Louisiana Insurance Guarantee Association for UCIC in the proceedings.
On October 15, 1996, the Calcasieu Parish School Board ("School Board") filed a third party demand against Reliance Insurance Company ("Reliance"). The School Board based its demand on a reinsurance agreement between Reliance and UCIC. Reliance answered claiming, because it has no rights or benefits pursuant to the reinsurance agreement, the School Board failed to state a right or cause of action in its third party demand. Reliance also filed exceptions of no right or cause of action, or alternatively, motion for summary judgment asserting the same defense. The Donaldsons then filed a third supplemental and amending petition, naming as additional defendants, Reliance, Trenwick America Reinsurance Corporation ("Trenwick"), American Reinsurance Corporation ("American") and SCOR Reinsurance Company ("SCOR"), asserting a direct action against these companies as a result of their reinsurance agreements with UCIC. In response, Reliance answered with a general denial and reasserted its exceptions and motion for summary judgment. Soon after the Donaldsons filed their amendment, the School Board filed a first supplemental and amending third party demand adding Trenwick, SCOR and American as third party defendants based on their reinsurance agreements with UCIC.
On July 7, 1997, Reliance's exceptions and motion for summary judgment as to the School Board's third party demand were heard and denied. Eleven days later, undaunted by the trial court's ruling, American, SCOR and Trenwick filed peremptory exceptions of no cause of action and no right of action and, in the alternative, a motion for summary judgment as to both the Donaldsons' and the School Board's claims. Reliance also reurged its previously denied exceptions and motion for summary judgment. After voluminous discovery, the trial court maintained the peremptory exception of no right of action and granted the motion for summary judgment in favor of American, SCOR and Trenwick. The trial court also maintained the peremptory exception of no right of action in favor of Reliance as to the claims of the Donaldsons. Further, the trial court granted summary judgment in favor of Reliance, dismissing all claims of the School Board and the Donaldsons, with prejudice. Both the School Board and the Donaldsons appeal this adverse judgment.

ISSUES
They contend the trial court erred in granting the defendant insurance companies' peremptory exceptions of no right of action and motions for summary judgment and dismissing the third party demand against the insurance companies.

LAW AND ANALYSIS

Peremptory Exception
Both the Donaldsons and the School Board claim the trial court erred in sustaining the defendant insurance companies' peremptory exception of no right of action. We disagree.
The School Board's argument, adopted by the Donaldsons, is that the reinsurance agreements between UCIC, American, SCOR, Trenwick and Reliance, represents a liability insurance policy, thus the insured and the injured party by virtue of La.R.S. 22:655 have a direct right of action against the reinsurers.
To determine the question at issue, it is essential that we first explore both the purpose and function of reinsurance. In Fontenot v. Marquette Cas. Co., 258 La. 671, 247 So.2d 572, 575 (1971) our Supreme Court addressed the concept of reinsurance for the first time. The Court said:

*679 Reinsurance is a contract by which one insurance company agrees to indemnify another in whole or in part against loss or liability which the latter has incurred under a separate contract as insurer of a third party. It is neither double insurance nor coinsurance `because regardless of the nature of the liability of the original insurer and the reinsurer, they are not coliable to the original insured, nor liable to him in the same degree.' 19 Couch on Insurance 2d s 80.2. Reinsurance is a method by which an insurance company distributes all or part of its potential losses to another insurance company in order to reduce the extent of its possible loss under any policy or policies it has issued. The insurer, or ceding company, allots to the reinsurer, or assuming company, that possible liability which in its judgment may exceed the amount its financial structure should safely assume on one risk....
Reinsurance is intended to benefit insurance companies and the public interest by (i) increasing an insurance company's capacity to accept new risks and allowing it to write risks that might otherwise be beyond its capacity, (ii) by stabilizing an insurance company's operating results, (iii) by enabling the spread of catastrophic risks, and (iv) by allowing greater competition among insurers. Id.
The amicus curiae brief filed by the Reinsurance Association of America thoroughly explains how reinsurance works:
When a primary insurance company issues a policy it does several things. It negotiates coverage with the insured, and issues policy language intended to embody the coverage negotiated. Additionally, the insurer must comply with a host of state laws regulating the sale of insurance, including laws regulating premium rates, expenses, reserves, valuation of assets, policy forms and other matters.
An insurer is not obligated to reinsure its insurance contracts. However, if the insurer chooses to purchase reinsurance protection, it does so for its benefit alone. The reinsurance contract is a completely separate and unrelated transaction from the insured's perspective. In fact, the insured usually is not even aware of the existence of the reinsurer. And a reinsurer typically is not a party to negotiations between an insurer and its insured, which results in the contract of insurance. Writing the insurance contract and managing the account is the responsibility of the insurer alone. The primary insurer is almost always the only party to ever deal directly with the policy holder, and despite its reinsurance, the primary insurer remains fully liable to the policyholder on the entire risk covered.
When a claim is made by the insured to the insurer, investigating and managing the claim continues to be the sole responsibility of the insurer, unless the reinsurer agrees otherwise. The reinsurer is not required to reimburse the insurer for its portion of the responsibilities under the insurance contract until the insurer determines whether it, the insurer, is liable to pay a covered claim. In fact, the reinsurer "may not second guess the [insurer's] good faith decision to pay any claim that is arguably subject to coverage." Hence, the reinsurer has no responsibility for a claim until a coverage determination is made....
As a result of the foregoing, a contract of primary insurance (between a policyholder and a primary insurer) is known as a "contract of liability." The risk assumed by the reinsurer is of a more limited nature, constituting a "contract of indemnity" with the obligation to indemnify only to the ceding company....
Our Supreme Court has consistently held that reinsurers and policies of reinsurance are not susceptible to suit by third parties (someone other than the liability insurer). In Fontenot, the Court held a reinsurance agreement does not create any right of action in third parties directly against the reinsurer. These parties are *680 prevented from enforcing the insurer's contract for reinsurance against the reinsurer because they are "not a party to or in privity to that contract of reinsurance." Fontenot, 247 So.2d at 576, citing, 13 Appleman, Insurance Law and Practice, § 7694; 46 C.J.S. Insurance § 1232; 44 Am.Jur.2d, Insurance, § 1867. This holding was explicitly reaffirmed by the Court in Arrow Trucking Co. v. Continental Ins. Co., 465 So.2d 691 (La.1985). The Court emphasized: "[t]here does not exist against the reinsurer either a direct action or a substantive third party beneficiary claim on behalf of the original insured." Id. at 692. The decision rested not only on sound jurisprudence, but also on an interpretation by the Court of Louisiana's Direct Action Statute. The Court stated:
... a review of the entire direct action statute indicates that the legislature never intended that the provision would apply to a reinsurance contract or agreement.... For example, it is provided therein that "an action may ... be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315." Obviously, the reference here as to who may maintain the action is to the tort victim. It goes on to provide that "injured person or his or her survivors hereinabove referred to [under La.C.C. art. 2315], at their option shall have a direct action against the insurer...." It state that "it is also the intent of this Section that all liability policies ... are executed for the benefit of all injured persons, his or her survivors or heirs." And there is reference made in the provision to such things as the "omnibus clause" in the policy and the liability of the insured as a "tort-feasor."
Obviously, the direct action statute (La.R.S. 22:655) does not, nor was it ever intended to, apply to reinsurance agreements. The terms used in the direct action statute are foreign to such agreements. The direct action statute was enacted to give special rights of action to injured tort victims and not to insureds even if, ..., an insured may have a claim in contract against a reinsurer.
Id. at 700.
Despite these pronouncements by the Court, the School Board and the Donaldsons claim they have a right of action against the insurers. As support for their assertion, they cite Quinlan v. Liberty Bank and Trust Company, 575 So.2d 336 (La.1990) and Black v. First City Bank, 94-0423 (La.9/6/94); 642 So.2d 151, two more recent Supreme Court decisions which they believe overruled Fontenot and Arrow Trucking. After thoroughly examining the holdings in these decisions, we find their argument unavailing.
In Quinlan plaintiffs filed suit alleging the bank and its directors' and officers' liability insurer were liable for the negligent management of their funds by an officer of the bank. The directors' and officers' policy insured the bank and its directors against any claims made against the directors or officers caused by any bank directors' or officers' negligent act, error, omission or breach of duty while acting in their capacities as directors and officers. The lower court concluded the policy was an "indemnity policy," a policy which requires an insurer to pay the insured only after the insured has itself made a payment to the claimant. As such, the Court held the Direct Action Statute did not apply because only liability insurers, whose policies protect against a claim before any payment is made by the insurer, could be sued under that Statute. However when confronted with the issue, the Supreme Court concluded that La.R.S. 22:655 was promulgated to prevent an insurer from insulating itself from suit by framing its policy as an indemnity contract, as opposed to a contract of liability, or by inserting a "no action" clause in its policy. Accordingly, it held "the Direct Action Statute is a mandate for a tort victim to bring a direct suit to recover *681 damages for personal injury or ... damage from the tortfeasor's insurer, regardless of whether the insurer has framed the policy as a liability or an indemnity contract." Quinlan, 575 So.2d at 352. This basic premise was subsequently affirmed in Black.
In Quinlan and Black, suit was filed against primary insurers only. These decisions addressed only a primary insurer's amenability to suit. Prior to Quinlan and Black a direct action did not lie against the insurer when some type of indemnity policies were involved. The holdings in these cases established only that La.R.S. 22:655 applies to primary insurers even if they attempt to disguise their real undertaking by incorporating indemnity language in the policy. Because the insurance we are asked to review here clearly stems from a pure contract of reinsurance, the holding in these cases are not controlling. Neither are we convinced that Quinlan or Black overruled the Supreme Court's earlier ruling in Fontenot and Arrow Trucking. Accordingly, the trial court's decision granting the peremptory exception of no right of action was not legally wrong.

Summary Judgment
Next, the School Board and the Donaldsons claim that even if Quinlan and Black have not effectively overruled Fontenot and Arrow Trucking, the trial court's decision granting the insurers summary judgment nevertheless was erroneous, because the insuring agreement does not unambiguously purport to exclude such actions. Again, we disagree.
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish those ends. La.Code Civ.P. art. 966(A)(2). Further, La.Code Civ.P. art. 966(C) provides: (1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted; (2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
Article 966 brings Louisiana's standard for summary judgment closely in line with the federal standard found in Fed.Rule Civ.Pro. 56(c). Hayes v. Autin, 96-287 (La.App. 3 Cir. 12/26/96); 685 So.2d 691. Accordingly, "there is no genuine issue of material fact if the nonmoving party cannot come forward at the summary judgment stage with evidence of such sufficient quantity and quality for a reasonable juror to find the party can satisfy his substantive evidentiary burden." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Sassone v. Elder, 626 So.2d 345 (La.1993). Furthermore, La. Code Civ.P. art. 967 provides in pertinent part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate shall be rendered against him.
Again, both Fontenot and Arrow Trucking stand for the proposition that a third party cannot proceed against a reinsurer under the Direct Action Statute. *682 This rule of law, however, is not absolute. La.R.S. 22:943 provides:
Whenever an insurer agrees to assume and carry out directly with the policyholder any of the policy obligation of the ceding insurer under a reinsurance agreement, any claim existing or action or proceeding pending arising out of such policy by or against the ceding insurer with respect to such obligation may be prosecuted to judgment as if such reinsurance agreement had not been made, or the assuming insurer may be substituted in place of the ceding insurer.
Essentially, this statute allows a third party to directly sue the reinsurer only if the reinsurer has contracted to take on liability directly to the original insured as opposed to indemnifying the primary insurer for a loss suffered. This "cutoff provision" makes the third party a beneficiary to the reinsurance agreement. The cutoff provision is operative only if the reinsurance agreement clearly expresses the contracting parties' intent to stipulate some advantage for that (third) person. Arrow Trucking, 465 So.2d 691. To find the plaintiff's position meritorious, the reinsurance agreement must expressly declare "some advantage" for the benefit of either the School Board or the Donaldsons. "The proper resolution of whether this treaty for reinsurance is a contract of indemnity or of liability insurance, and whether third parties not in privity to the contract have a direct right of action against the reinsurer, should be made after a reading of the contract or the treaty to ascertain the intent of the parties and after an examination of the stipulations in the contract in light of the statutes applying to reinsurance." Fontenot, 247 So.2d at 579.
There is no ambiguity in the reinsurance agreement between UCIC and American. The reinsurance agreement clearly establishes the intent of the parties to contract for reinsurance only. No intent can be found, express or otherwise, that American assumed the original insurance policy obligation, thus creating a direct action under the reinsurance contract. The provisions of the contract establish just the opposite. We first point to the second paragraph on page one of the agreement which explicitly states:
The Reinsurer hereby reinsures the Company to the extent and on the terms and conditions subject to the exceptions, exclusions and limitations hereinafter set forth and nothing hereinafter shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third parties or any persons not parties to this Agreement.
Moreover, the American/UCIC reinsurance policy provided that it would insure UCIC as follows:
The Reinsurer agrees to reimburse the Company, on an excess of loss basis, for the amounts of ultimate net loss which the Company may pay as a result of losses occurring [within the policy period].
The term "ultimate net loss" is defined in the reinsurance agreement as:
the sum actually paid by the Company [UCIC] in settlement of losses for which it is held liable.
Furthermore, the reinsurance agreement provides that in the event of UCIC's insolvency, the proceeds due under the agreement shall be payable directly to UCIC's liquidator, not to a third party. The only parties to the reinsurance agreement are American and UCIC. The School Board was not a party to the agreement nor was it entered into for its benefit. We are convinced that American has only contracted to indemnify UCIC for any losses that it may suffer as a result of the insurance policy it issued to the School Board. There is no evidence indicating otherwise. Accordingly, American is entitled to judgment as a matter of law.
The agreements between UCIC, Reliance, Trenwick and SCOR, must be analyzed in a different fashion since none *683 of these reinsurers ever issued UCIC a formal policy. The only documents which evidence the reinsurance contract between UCIC and these reinsurers are the placement slips and cover notes issued by G & R, an intermediary who purchased insurance from the reinsurers on behalf of UCIC. The placement slip summarizes the terms and conditions agreed to by UCIC and the reinsurers. A cover note is considered a form of binder representing that the insurance has been procured and that the policy will follow at a later date. Although the cover note or binder is sufficient to evidence a contract, it does not stand independent from the policy. A binder is used to bind insurance temporarily pending the issuance of a policy. La.R.S. 22:631. The effect given to a binder is always a question of intent of the parties. Couch on Insurance, § 13:17, (3d ed.1995). The binder is subject to the conditions of the policy contemplated though such policy may never issue. Appleman, et al., Insurance Law and Practice, § 7232, (1981). In Great American Insurance Co. v. Maxey, 193 F.2d 151 (5th Cir.1951), the United States Fifth Circuit held:
As stated in Appleman, the terms and provisions which control in the construction of coverage afforded by a binder are those contained in the ordinary form of the policy usually issued by the company at the time upon similar risks. The binder is subject to the conditions of the policy contemplated, though such policy may never issue. The standard form of the contract in use by the insurer at the time may be referred to, to ascertain the coverage....
In determining whether or not the School Board or the Donaldsons have any rights under the reinsurance agreements, as represented by the cover note, we must examine both the binder and the policy usually issued by the insurer at the time on similar risks.
The cover note shows only UCIC's acceptance of general terms and conditions which were to be incorporated into the formal contract. The only salient feature of the binder is UCIC's acknowledgment that its relationship with the reinsurers would be governed by several "standard clauses," such as "definitions" and "ultimate net loss."
Reliance, SCOR and Trenwick all assert that the term "standard clauses" refers to clauses in the formally issued American/UCIC policy. Thus, they reinsured UCIC on the same terms and conditions as American. According to the reinsurers, the American/UCIC agreement is the policy usually issued by them under like circumstances. They contend it is custom and standard practice in the reinsurance industry for the lead insurer to set the terms and conditions of the reinsurance policy, and for the following reinsurers, once they issue their policies, to replicate these contractual provisions in their entirety. In this case, American was responsible for 76 percent of the coverage, whereas Reliance, SCOR, and Trenwick together reinsured 24 percent of the loss. Steven K. Bolland, senior vice-president with G & R Intermediaries stated that the formalized reinsurance policies would contain coverage provisions identical to the American/UCIC treaty. Chief amongst them is the provision denying third parties any interest or right of action under the reinsurance agreement. Bolland also testified to these same facts in a deposition. He declared:
Q: And can you describe to me briefly how this agreement was to work, lets say there was a million dollar loss sustained by UCIC, how would this agreement be effected?
A: [...] such reports would continue in until the claim was finalized, settled or which time United Community would provide to the reinsurer a proof that they had paid certain monies and ask reinsurer to reimburse them in the sum of $500,000 in excess of $500,000 each and every occurrence.
*684 Later in the deposition, Bolland again confirmed that the Reliance, Trenwick and SCOR reinsurance agreements were intended to be duplicates of the American reinsurance policy:
Q: I'm sorry, when you were placing the reinsurance with SCOR, Trenwick, and Reliance what was the agreement that you were using as a model or the basis for the agreement that you were going to participate in?
A: I was provided with a copy of American Re's Placement Slip, which I duplicated and passed on to the reinsurers in the broker market adding only an intermediary clause and a brokerage amount.
Q: Now, that Placement Slip that you just mentioned, did it contain the material sections and elements of the reinsurance agreement that you were going to have Trenwick, Reliance and SCOR participate in?
A: ItIt contained exactly the wording and content of the cover note provided in my affidavit as defendant's Exhibit 1.
Q: Yes, sir. You had said, I believe, that it was custom in practice in the industry for the other reinsurers to follow the lead, by that you mean to follow American Re's lead?
A: In this instance, American Re set the terms and conditions with UCIC, therefore, it would be appropriate for them to document their agreement by writing the wording, and therefore, it would be normal market practice for the other reinsurers to agree to follow such terms.
Q: That was your intention?
A: Correct.
Q: That was the intention as far as you know and as you know of SCOR, Trenwick, and Reliance?
A: And of UCIC.
Similarly, officials for Reliance, SCOR, and Trenwick all testified that they reinsured UCIC on the same terms and conditions as American and that it was standard industry practice to do so.
The School Board and the Donaldsons submitted no evidence contradicting the insurers testimony that their agreement with UCIC was governed by the provisions of the American/UCIC policy, thereby providing indemnity only in the event of a loss. Instead, they argue the cover note (the insuring agreement) is ambiguous and as such, it must be construed against the insurer and in favor of allowing a direct action. In support of this assertion they rely on the Quinlan decision. However, their reliance again is misplaced. As mentioned, the Quinlan decision addresses only primary insurance policies and not reinsurance agreements. They argue, further, even if the terms of the American policy govern, it does not unambiguously and beyond genuine dispute exclude liability coverage. This Court has carefully perused the entire UCIC/American reinsurance agreement, and we are wholly convinced that it bars a right of action by a third party. The School Board and the Donaldsons have provided no evidence refuting the reinsurer's contention that, as per industry custom, reinsurance was provided to UCIC pursuant to the same terms and conditions of the American policy. Accordingly, we find there is no genuine issue of material fact; and, therefore Reliance, SCOR, and Trenwick are entitled to summary judgment as a matter of law.

DECREE
For the foregoing reasons, the judgment of the trial court sustaining the peremptory exception of no right of action is affirmed. Likewise, we affirm the trial court's decision granting summary judgment in favor of the American, Reliance, SCOR, and Trenwick. All costs of this *685 appeal are assessed against the Donaldsons and the School Board.
AFFIRMED.