2007 UT 39

**Robert E. WILCOX, Utah Insurance Commissioner, as Liquidator of Southern American Insurance Company, Plaintiff and Appellee,**

v.

**ANCHOR WATE CO., Permanent Concrete, Inc., and Lafarge Corporation, Defendants and Appellants.**

No. 20050324.

Supreme Court of Utah.

May 11, 2007.

Rehearing Denied May 9, 2007.

Craig Carlile, Brent D. Wride, Elaine A. Monson, Salt Lake City, for plaintiff.

Cass C. Butler, Mark L. Callister, Salt Lake City, for defendants.

## AMENDED OPINION

PARRISH, Justice:

¶ 1 Plaintiff Robert Wilcox ("Liquidator"), as liquidator for the Utah Insurance Department, brought this action against defendants Anchor Wate Company and its related companies ("Anchor Wate" or the "insured"), alleging that $3.5 million in payments that Anchor Wate had received from Southern American Insurance Company ("SAIC" or the "insurer") constitute voidable preferences under the Utah Insurers Rehabilitation and Liquidation Act (the "Act").[1] Anchor Wate received the payments pursuant to an insurance policy it purchased from SAIC, and various reinsurers indemnified SAIC for the payments.

¶ 2 The district court granted the Liquidator's motion for summary judgment, ordering Anchor Wate to return the payments to the estate and awarding prejudgment interest at a rate of 10% per annum. On appeal, Anchor Wate contends that the district court erred in concluding that the payments made to Anchor Wate were voidable preferences. Anchor Wate further contends that the district court erred in awarding prejudgment interest at the 10% rate specified in Utah

---

1. Utah Code Ann. § 31A–27–321 (2002).

Code section 15–5–1 (2001). We affirm the district court's conclusion that SAIC's payments to Anchor Wate constituted voidable preferences, but reverse its ruling regarding the applicable prejudgment interest rate.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 In 1985, Anchor Wate purchased a $5 million commercial liability insurance policy from SAIC. Several years prior to issuing the Anchor Wate policy, SAIC had purchased three separate reinsurance policies requiring the reinsurers to reimburse SAIC for losses covered by the respective policies.[2]

¶ 4 In September 1989, All American Pipeline Company ("All American") filed a lawsuit against Anchor Wate. Anchor Wate tendered the defense of the suit to SAIC, and SAIC notified the reinsurers. In July 1991, Anchor Wate filed suit against SAIC, seeking damages for SAIC's alleged bad faith refusal to defend and settle the All American lawsuit. SAIC supervisor Rex Hess notified the reinsurers of this action and provided them with a legal analysis prepared by SAIC's outside counsel advising that SAIC tender the policy limits to Anchor Wate. There is some evidence that the reinsurers, particularly Skandia, approved of this tender.

¶ 5 SAIC indicated its intent to tender its $5 million policy limits to Anchor Wate on July 31, 1991, and faxed the proposed tender letter to its reinsurers six days later. On October 30, 1991, SAIC faxed cash calls to its reinsurers indicating that the purpose of the request was to fund the All American claim. The next day, reinsurer Skandia issued SAIC two checks totaling approximately $4.5 million. The checks listed Anchor Wate and Permanent Concrete as "ceding compan[ies]" and referred to All American claim No. 900147. Reinsurer National issued a check in the approximate amount of $122,000 on November 7, 1991, which similarly indicated that it was for the "Permanent Concrete & Anchor Clm # 900147."

¶ 6 SAIC deposited these funds into its general operating account at Zion's Bank. Pursuant to standard practice, all but $15,000 was swept out of this account and into another SAIC account. On December 9, 1991, SAIC delivered a $3 million check to Anchor Wate. Approximately a week later, SAIC and Anchor Wate executed a "Release and Indemnity Agreement" ("Release"), memorializing their prior agreement that SAIC would pay Anchor Wate its $5 million policy limit in return for a release of claims against SAIC and any connected third parties, including SAIC's reinsurers. SAIC and Anchor Wate subsequently modified their agreement to allow SAIC to pay the remaining $2 million in four equal installments of $500,000 each. On March 12, 1992, SAIC wired the first $500,000 installment to Anchor Wate from an account at Valley Bank.

¶ 7 On March 26, 1992, the Utah Insurance Department placed SAIC into involuntary liquidation, and Anchor Wate filed a proof of claim for the $1.5 million it was owed under the settlement agreement. In November 1992, Anchor Wate forwarded to All American the $3.5 million that it had received from SAIC. Some sixteen months later, the Liquidator filed a preference action against Anchor Wate, seeking to recover as a voidable preference the $3.5 million that Anchor Wate had received from SAIC.

¶ 8 Following written discovery, Anchor Wate moved for summary judgment, arguing that the $3.5 million it had received from SAIC did not constitute a voidable preference under section 31A–27–321 of the Liquidation Act. The Liquidator filed a cross-motion for summary judgment, contending that the payments did constitute a preference and that he was entitled to interest.

¶ 9 On April 17, 2003, the district court denied Anchor Wate's motion for summary judgment and granted the Liquidator's. It thereafter entered judgment against Anchor Wate in the amount of $3.5 million, plus prejudgment interest at 10% and post-

2. These policies consist of (1) a Net Retained Lines Quota Share Reinsurance Agreement from Planet Insurance Company ("Planet") and Reliance Insurance Company ("Reliance"), (2) a Combined Casualty Quota Share and Excess of Loss Reinsurance Agreement from National Reinsurance Company ("National") and Skandia American Reinsurance Corporation ("Skandia"), and (3) a Casualty Facultative Treaty Reinsurance Agreement from Skandia.

judgment interest at 3.41%. Anchor Wate sought to amend the judgment pursuant to rule 59 of the Utah Rules of Civil Procedure, arguing that the prejudgment interest rate applied by the district court was erroneously high and that its accrual should be tolled due to the Liquidator's delay. The district court rejected Anchor Wate's challenge to the interest rate, but granted a trial on the question of accrual. The parties subsequently entered into a stipulated agreement resolving the accrual issue. Anchor Wate timely appealed, and we have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## ANALYSIS

¶ 10 We review the district court's entry of summary judgment for correctness.[3] We recognize that "[s]ummary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[4] Having set forth the applicable standard of review, we proceed to the substantive issues. We begin by examining whether the district court erred in determining that the Liquidator had established the elements of a voidable preference, enabling it to recover the $3.5 million that Anchor Wate had received from SAIC. Concluding that the district court appropriately granted summary judgment in favor of the Liquidator, we then consider whether the district court applied the correct rate of prejudgment interest. We hold that it did not and therefore remand for application of the appropriate rate.

## I. UTAH CODE SECTION 31A–27–321

¶ 11 We begin by considering whether SAIC's payments to Anchor Wate constitute voidable preferences under the Liquidation Act.[5] When interpreting the voidable preference provisions of the Liquidation Act, we previously have stated that Utah courts may look for guidance to federal bankruptcy law and its interpreting precedent.[6] This is so because federal bankruptcy law and the voidable preference provisions of the Liquidation Act share the common purpose of effectuating "proportionate distribution of the debtor's assets among its creditors," thereby preventing "a transfer to one creditor that would diminish the estate of the debtor that otherwise would be available for distribution to all."[7]

¶ 12 To establish a voidable preference under the Liquidation Act, there must be

> a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or allowed by the insurer within one year before the filing of a successful petition for rehabilitation or liquidation ..., the effect of which transfer may enable the creditor to obtain a greater percentage of his debt than another creditor of the same class would receive.[8]

¶ 13 The only two of these elements in dispute are whether there was a transfer of SAIC's property and whether this transfer enabled Anchor Wate to receive a greater percentage of its debt than other SAIC creditors of the same class. We therefore confine our analysis to these issues.

### A. Transfer of the Insurer's Property

¶ 14 Courts generally construe the transfer of property requirement broadly so that "all legal or equitable interests" are considered property of the debtor's estate.[9] Accordingly, funds paid by SAIC to Anchor Wate would be considered property of SAIC's estate unless Anchor Wate had a direct interest in the proceeds at the time SAIC received them from the reinsurers.

3. *Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 22, 979 P.2d 332; *Higgins v. Salt Lake County*, 855 P.2d 231, 235 (Utah 1993).

4. *Norman v. Arnold*, 2002 UT 81, ¶ 15, 57 P.3d 997; *see also* Utah R. Civ. P. 56(c).

5. Utah Code Ann. § 31A–27–321(1)(a) (2005).

6. *Wilcox v. CSX Corp.*, 2003 UT 21, ¶¶ 1, 9, 70 P.3d 85.

7. *Id.* ¶ 9 (internal quotation marks omitted).

8. Utah Code Ann. § 31A–27–321(1)(a).

9. *In re Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993); *accord In re Moses*, 256 B.R. 641, 645 (10th Cir.2000).

For the reasons detailed below, we find that neither the reinsurance agreements nor any theory Anchor Wate advances establishes such an interest; therefore, the district court correctly determined that the reinsurance proceeds were part of SAIC's estate.

■ ¶ 15 As a general matter, an insured has no legal interest in reinsurance proceeds.[10] Such a rule is consistent with the purpose of reinsurance contracts, which is to *indemnify the insurer* for any loss the insurer experiences, not to protect the insured.[11] Indeed, "if the insurer chooses to purchase reinsurance protection, it does so for its benefit alone." [12] The reinsurance contract is not tied to the contract between the insurer and its insured; it is a completely separate and unrelated transaction. In fact, the original insured is seldom aware of the existence of the reinsurer. [13]

■ ¶ 16 This general rule does not apply when a reinsurer has agreed to give an original insured a direct claim to the proceeds of a reinsurance policy.[14] But any such agreement must explicitly give the insured such an interest. Such agreements may state that the reinsurer itself "takes charge of and manages the defense of suits against the original insured" or in some other way provide that the original insured directly benefits from the reinsurance contract.[15] Absent such a provision, a reinsurer has no liability to the original insured.[16]

¶ 17 In this case, there is no agreement giving Anchor Wate any direct claim to the reinsurance proceeds or any cause of action against the reinsurers. The only parties to the reinsurance agreements are the reinsurers and SAIC, and those agreements clearly describe their purpose as indemnifying SAIC. Indeed, they explicitly specify that SAIC's insureds have no rights under these agreements.

¶ 18 Both the Net Retained Lines Reinsurance Agreement and the Quota Share and Excess of Loss Reinsurance Agreement provide that "[t]his Agreement is to indemnify the Reinsured." The Casualty Agreement similarly provides that "[t]his Agreement is solely between the Company [SAIC] and the Reinsurer.... In no instance shall any insured of [SAIC], or any claimant against an insured of [SAIC], have any rights under this Agreement."

¶ 19 The Net Retained Lines Reinsurance Agreement also specifically addresses the potential insolvency of SAIC. It states, "Nor shall anything in this insolvency clause in any manner create any obligations or establish any rights against the Reinsurer in favor of any third parties or any persons not parties to this Agreement." Rather, in the event of insolvency, any money owed under the agreement shall be paid "directly to the Reinsured or its liquidator." Language such as this is the basis on which other courts have concluded that a third-party original insured has no interest in the proceeds from a reinsurance policy.[17] Such provisions, bolstered by the fact that SAIC entered into the reinsurance agreements years prior to insuring Anchor

10. *See United States v. Fed. Surety Co.,* 72 F.2d 964, 967 (4th Cir.1934); *Safeway Trails, Inc. v. Stuyvesant Ins. Co.,* 211 F.Supp. 227, 233 (M.D.N.C.1962); *Venetsanos v. Zucker,* 271 N.J.Super. 459, 638 A.2d 1333, 1339 (1994); Spencer L. Kimball, *Cases and Materials on Insurance Law* 592 (1992) ("Except in unusual situations there is no legal relationship between the reinsurer and the original insured.").

11. *See Fed. Surety Co.,* 72 F.2d at 967; *Safeway Trails,* 211 F.Supp. at 233; *Venetsanos,* 638 A.2d at 1339.

12. *Donaldson v. United Cmty. Ins. Co.,* 741 So.2d 676, 679 (La.Ct.App.1999).

13. *Id.*

14. *See Fed. Surety Co.,* 72 F.2d at 967–68; *Gen. Reinsurance Corp. v. Mo. Gen. Ins. Co.,* 458

F.Supp. 1, 4–5 (W.D.Mo.1977); *Venetsanos,* 638 A.2d at 1339–40.

15. *Venetsanos,* 638 A.2d at 1339; *see also Fed. Surety Co.,* 72 F.2d at 967; *Donaldson,* 741 So.2d at 682.

16. *See Safeway Trails,* 211 F.Supp. at 233 (indicating that in the typical reinsurance contract, "no action will lie between an original policyholder of insurance and the company reinsuring that policy on behalf of the company issuing [that policy]"); *Donaldson,* 741 So.2d at 679 ("[R]einsurers and policies of reinsurance are not susceptible to suit by third parties.").

17. *See, e.g., Safeway Trails,* 211 F.Supp. at 233–34; *Donaldson,* 741 So.2d at 682.

Wate, demonstrate that the reinsurance proceeds were the property of SAIC and therefore subject to the preference statute.

¶ 20 Despite this contractual language, Anchor Wate argues that the proceeds never became part of SAIC's estate because SAIC did not have the "right to disburse funds to whomever it wished."[18] To support this assertion, Anchor Wate points to correspondence between SAIC and its reinsurers suggesting that the reinsurance payments would go toward paying the Anchor Wate claim. It further contends that it was in the reinsurers' best interests to tender the policy amounts because, under at least one of the reinsurance agreements, the reinsurers' liability to SAIC "include[d] any judgment rendered against an original insured which is in excess of the limits provided by the Reinsured's policy and for which the Reinsured is held liable as a result of alleged or actual bad faith ... in the duty to defend." Anchor Wate also relies on the release it signed in which it released not only SAIC, but also its "reinsurers." Because the reinsurers believed that SAIC would use the reinsurance proceeds to pay Anchor Wate, Anchor Wate argues that the proceeds were never the property of SAIC and were therefore not subject to the Liquidator's preference action.

¶ 21 Even assuming a belief on the part of the reinsurers that the reinsurance proceeds would go toward the Anchor Wate claim, there is still no evidence suggesting that Anchor Wate had a direct claim to the reinsurance proceeds. Indeed, Anchor Wate concedes that it "did not have the right to demand payment directly from the reinsurers." The reinsurers' only responsibility was to indemnify SAIC for its losses. Once they fulfilled this responsibility, they were not required to ensure that SAIC distributed the funds to Anchor Wate and were not subject to bad faith exposure if SAIC failed to do so. And the Release purporting to absolve the reinsurers from any liability to Anchor Wate, to which the reinsurers were not party, does not establish that Anchor Wate ever had any basis for asserting a claim against the reinsurers in the first place. Because Anchor Wate has not established any facts indicating that Anchor Wate had any direct claim against the reinsurers, the district court properly concluded that the reinsurance proceeds were the property of SAIC.

¶ 22 Anchor Wate urges us to avoid this conclusion by adopting any one of three theories pursuant to which courts have declined to apply voidable preference statutes. We examine and reject each of these theories, concluding that the absence of any agreement giving Anchor Wate a direct claim to the reinsurance proceeds is dispositive.

### 1. *In re Edgeworth*

¶ 23 Relying on *In re Edgeworth*,[19] a Fifth Circuit case involving the proceeds of a malpractice liability insurance policy, Anchor Wate argues that the proceeds of the reinsurance contracts never became the property of SAIC. Because the proceeds of many liability policies are "payable only for the benefit of those harmed by the debtor under the terms of the insurance contract," the *Edgeworth* court reasoned that the debtor does not have "a cognizable interest in the proceeds" and, therefore, the proceeds do not become part of the debtor's estate.[20]

¶ 24 We decline to apply *Edgeworth's* rationale here because we disagree with its premise. Rather, we align ourselves with those courts holding that the proceeds of insurance policies are part of the property of the debtor's estate.[21] Indeed, subsequent cases from the Fifth Circuit have characterized *Edgeworth* as an outlier to this general line of jurisprudence.[22]

¶ 25 Moreover, were we inclined to agree with *Edgeworth's* reasoning, it simply does not apply here. In concluding that the insurance proceeds at issue never became part of the debtor's estate, the *Edgeworth* court relied on the fact that the policy at issue was a

**18.** *In re Superior Stamp & Coin Co.*, 223 F.3d 1004, 1009 (9th Cir.2000).

**19.** 993 F.2d 51, 55 (5th Cir.1993).

**20.** *Id.* at 55–56.

**21.** *In re Vitek, Inc.*, 51 F.3d 530, 534 & n. 17 (5th Cir.1995).

**22.** *See id.* at 534 n. 17.

liability policy. In *Edgeworth,* the proceeds were "made payable" to a third party; the debtor was not a beneficiary of the policy and had no "cognizable interest" in it.[23] Neither of these facts is present in this case, which involves an indemnity policy that does give the debtor an interest in the proceeds and, in fact, specifically disclaims any interest in the original insured.

### 2. The Earmarking Doctrine

¶ 26 Anchor Wate also urges us to hold that the reinsurance proceeds did not become part of SAIC's estate because the funds were "earmarked" for Anchor Wate. "Earmarking is a judicially-created doctrine said to apply when a new creditor pays a debtor's existing debt to an old creditor."[24] Funds are "earmarked" and therefore not part of the debtor's estate where there is

(1) the existence of an agreement between the new lender and the debtor that the funds will be used to pay a specified antecedent debt [to a specific creditor],

(2) performance of the agreement according to its terms, and

(3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.[25]

Some courts also examine the amount of control the debtor exercised over the funds or whether "the estate was diminished by the transfer."[26]

¶ 27 We decline to apply the earmarking doctrine here because it was never intended to apply to reinsurance cases. And in any event, we conclude that Anchor Wate cannot establish the elements of an earmarking claim.

¶ 28 Application of the earmarking doctrine in recent decisions has generally been restricted to loan cases where "a third party lends money to the debtor for the specific purpose of paying a selected creditor."[27] Historically, the doctrine's use was even more limited; courts used it when a "new creditor, who was obligated on an existing debt as a guarantor or surety, provided the debtor with funds to pay the creditor."[28] The doctrine is restrictive because it was created for the very limited purpose of protecting the guarantor or codebtor who "would be subject to double liability" should its transfer to the debtor be considered a voidable preference.[29]

¶ 29 The earmarking doctrine was later expanded to cover situations where "the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor."[30] But such an expansion was justified because a third-party loan does not diminish the estate—it merely substitutes creditors.[31] This same rationale does not apply in reinsurance situations. Expanding the earmarking doctrine to such situations would not only divorce this doctrine from the historical policies justifying its existence, it would create a situation where the debtor's payment to its original insured would directly diminish the amount of the debtor's estate available for

---

23. *Edgeworth,* 993 F.2d at 56.

24. *In re Moses,* 256 B.R. 641, 645 (10th Cir. 2000).

25. *Id.* at 649 (internal quotation marks omitted).

26. *Id.* at 650; *see also In re Superior Stamp & Coin Co.,* 223 F.3d 1004, 1005 (9th Cir.2000).

27. *In re Francis,* 252 B.R. 143, 145 (Bankr. E.D.Ark.2000).

28. *Moses,* 256 B.R. at 645.

29. *Id.* at 646.

30. *Id.; see also Collier on Bankruptcy* § 547.03[2] (15th rev. ed. 2006) ("When a third person makes a *loan* to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created." (emphasis added)).

31. *Collier on Bankruptcy, supra* note 30, § 547.03[2] (" 'If all that occurs in a "transfer" is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed.' " (quoting *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir.1986))).

other creditors.[32] At least one court has warned that " '[e]xtension of the earmarking doctrine beyond the guarantor situation is both unwise and unwarranted, and would inevitably result in an inequitable treatment of creditors.' "[33]

¶ 30 The purpose of the Liquidation Act is to equitably distribute funds among creditors. We conclude that it would be inconsistent with both this statutory purpose and the broad scope of the statutory language to expand the scope of the earmarking doctrine.[34]

■ ¶ 31 Policy arguments aside, we also decline to apply the earmarking doctrine here because Anchor Wate cannot establish the required elements. As has been previously explained, the reinsurers and SAIC did not specifically agree that the reinsurance proceeds would be targeted to pay only the Anchor Wate claim. Rather, the reinsurance agreements provided that third parties, such as Anchor Wate, would have no right under them. And because there was no agreement giving Anchor Wate any claim to the reinsurance proceeds, there could have been no performance of such an agreement. Finally, as discussed below, Anchor Wate cannot establish that the transfer would not result in a diminution of the debtor's estate because the money that SAIC received would have otherwise been available for distribution to all of its creditors.

¶ 32 Anchor Wate similarly cannot establish an earmarking claim under the control test. Under the control test, funds can be earmarked only if the debtor has exercised no control over them.[35] In determining whether a debtor or an insurer has control of funds, "courts typically consider whether the new creditor restricted the use of the funds, whether the debtor had physical control over the funds, and whether the debtor had the ability to direct to whom the funds should be paid."[36] Although physical possession alone may not necessarily demonstrate the right to control,[37] at least one court has found that a debtor did control funds where they were deposited into the debtor's general checking account and not put into an identifiable, segregated trust account.[38]

¶ 33 In this case, SAIC deposited the reinsurance funds into its general account where, in the ordinary course of business, they were swept into another account and commingled with other funds. This demonstrates that SAIC "had the right to disburse the funds to whomever it wished."[39] And even though there is evidence that the reinsurers expected the funds to be used to pay the Anchor Wate claim, there is no evidence suggesting that the reinsurers advanced these funds only "on the condition" that Anchor Wate be paid.[40] Rather, Anchor Wate had no rights under the reinsurance contracts because they provided that any funds disbursed thereunder were intended to indemnify SAIC. SAIC therefore had complete control over the funds, preventing application of the earmarking doctrine.

### 3. Constructive Trust

■ ¶ 34 Anchor Wate next asserts that the reinsurance proceeds were never the property of SAIC because SAIC was merely holding them in constructive trust for Anchor

---

**32.** *See id.*

**33.** *Moses,* 256 B.R. at 647 (quoting *In re Int'l Club Enters.,* 109 B.R. 562, 567 (Bankr.D.R.I. 1990)).

**34.** *See id.* at 648. *But see* Margot Wickman–Bennett, Note, *Earmarking in the Eighth Circuit,* 79 Iowa L.Rev. 965, 976 (1994) (arguing that it would be appropriate to expand the earmarking doctrine to include nonguarantors).

**35.** *Moses,* 256 B.R. at 650; *In re Pioneer Commercial Funding Corp.,* 140 B.R. 951, 955–56 (Bankr.S.D.N.Y.1992).

**36.** *Moses,* 256 B.R. at 650.

**37.** *See In re Superior Stamp,* 223 F.3d 1004, 1008 (9th Cir.2000).

**38.** *Pioneer,* 140 B.R. at 956; *see also Collier on Bankruptcy, supra* note 30, § 547.03 (15th ed. rev.2006) (" '[W]e note that in a situation where a debtor never physically controls or owns the disputed funds, a preference is much less likely to arise.' " (quoting *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1361–62 (5th Cir.1986))).

**39.** *Superior Stamp,* 223 F.3d at 1009.

**40.** *Id.* at 1010.

Wate. Courts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior.[41] Such trusts are usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another.[42] In bankruptcy, where a debtor holds funds in constructive trust, those funds are not subject to preference claims.[43] But we decline to impose a constructive trust here because Anchor Wate has failed to establish the requisite elements.

¶ 35 First, Anchor Wate has failed to show the existence of any wrongful act. To establish a wrongful act under Utah law, an entity must have obviously received funds by mistake or participated in active or egregious misconduct.[44] In this case, no wrongful act has been perpetrated by SAIC against Anchor Wate. The reinsurance agreements expressly state that third parties, like Anchor Wate, have no interest in any reinsurance proceeds. SAIC legally received the reinsurance proceeds and deposited them into its own bank account. Although Anchor Wate suggests that it should have been paid before SAIC made cash calls on the reinsurers, the reinsurance agreements specifically state that SAIC has a right to receive an advance of funds on claims over $100,000. And even assuming some fraud was perpetrated by SAIC in the receipt of these funds, the fraud was perpetrated against the reinsurers, not Anchor Wate. In short, Anchor Wate cannot show illegal or egregious conduct directed against its interests.

¶ 36 Anchor Wate likewise cannot show that SAIC was unjustly enriched. Under its contract with the reinsurers, SAIC was entitled to indemnification for amounts paid on Anchor Wate's claims. Although SAIC's liquidation allowed it to avoid paying off Anchor Wate's claim in full, such a circumstance does not constitute unjust enrichment. The same rationale applies here as in the bankruptcy context, where the federal courts have recognized that

> [w]henever a debtor retains a benefit afforded it by a creditor without paying that creditor in full, the estate is arguably "unjustly enriched." Yet this situation is a result of a congressional policy choice incorporated into the Bankruptcy Code, and born of the reality that an insolvent debtor, by definition, is unable to satisfy in full the debts owed to its creditors. In light of this congressional policy choice and the reality that other similarly situated creditors are also receiving less than full payment of their claims, the estate's retention of the Disputed Funds subject to pro-rata distribution is not "unjust" under the circumstances.[45]

¶ 37 We accordingly hold that SAIC was not unjustly enriched in the manner contemplated by the unjust enrichment prong of the constructive trust test when it retained the reinsurance proceeds. Having determined that Anchor Wate can establish neither a wrongful act nor unjust enrichment, we conclude that Anchor Wate did not establish the elements required for the imposition of a constructive trust. We therefore need not address the third requirement for imposition of a constructive trust—the tracing requirement.

¶ 38 In summary, Anchor Wate cannot establish the elements of a constructive trust or any other theory that would provide it with a direct claim to the reinsurance proceeds. We therefore hold that the reinsurance proceeds were property of SAIC's estate and that this property was transferred when it was passed to Anchor Wate.

---

41. *In re Capital Mtg. Loan Corp.*, 60 B.R. 915, 918 (Bankr.D.Utah 1986), *aff'd*, 99 B.R. 462 (D.Utah 1987), *aff'd*, 917 F.2d 424 (10th Cir. 1990).

42. *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 599 (Utah 1983).

43. *See In Re Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir.1994).

44. *See, e.g., id.* at 322 (involving a case where a creditor mistakenly transferred money to a debtor); *Corp. of the President of the Church of Jesus Christ of Latter-Day Saints v. Jolley*, 24 Utah 2d 187, 467 P.2d 984, 984 (1970) (involving a constructive trust that was placed on a third person after she was given a stolen automobile).

45. *First Sec. Bank of Utah v. Gillman*, 158 B.R. 498, 507–08 (D.Utah 1993).

**B. The Transfer Enabled Anchor Wate to Receive a Greater Percentage of Its Debt Than Other Creditors of the Same Class**

¶ 39 Having determined that the reinsurance proceeds were part of SAIC's estate, we now address whether SAIC's transfer of the $3.5 million to Anchor Wate enabled Anchor Wate to receive a greater percentage of its debt than creditors of the same class, thus allowing the Liquidator to establish a voidable preference under the Liquidation Act.

¶ 40 As a general matter, a transfer enables a creditor to receive more than another similarly situated creditor when the transfer "diminish[es] the fund to which other creditors can legally resort for the payment of their debts, thus making it impossible for other creditors of the same class to obtain as great a percentage as the favored one." [46] Concerns about equity necessitate the well-recognized policy that "a debtor should not be able to make transfers on the eve of liquidation that deplete the debtor's assets to the detriment of the other creditors." [47] In determining whether there was such a voidable transfer, "[t]he focus of the court must be on the effect of the payment." [48]

¶ 41 In this case, the effect of SAIC's payment to Anchor Wate was to directly deplete SAIC's estate. The $3.5 million that would have been available for division among all of SAIC's creditors went solely to Anchor Wate. We therefore hold that the entire $3.5 million must be brought back into SAIC's estate to be distributed pro rata among all creditors of the same class.

**II. THE INTEREST RATE SPECIFIED IN UTAH CODE SECTION 15–1–1 DOES NOT APPLY TO PREFERENCE ACTIONS UNDER THE LIQUIDATION ACT**

¶ 42 Having upheld the district court's judgment on the preference issue, we consider whether the district court applied the appropriate rate of prejudgment interest. The Liquidation Act does not specify the rate of prejudgment interest applicable to judgments obtained under its voidable preference provisions. The district court therefore applied the 10% per annum rate specified by Utah Code section 15–1–1(2). [49]

¶ 43 Title 15 of the Utah Code is entitled "Contracts and Obligations in General." The interest rate applied by the district court is that specified in chapter 1 of title 15. Chapter 1 provides in relevant part:

**15–1–1. Interest rates—Contracted rate—Legal rate.**

(1) The parties to a lawful contract may agree upon any rate of interest for the loan or forbearance of any money, goods, or chose in action that is the subject of their contract.

(2) Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum. [50]

The question presented by Anchor Wate's challenge to the interest rate is whether the 10% default rate specified by section 15–1–1(2) is applicable to the Liquidator's judgment obtained pursuant to the voidable preference provisions of the Liquidation Act. [51] We conclude that it is not.

¶ 44 The theoretical underpinning behind section 15–1–1 is that the parties to a lawful contract may agree upon any rate of interest for the loan or forbearance of money, goods, or causes of action that are the subject of their contract. Only when the parties to a contract fail to specify a rate of interest does the default rate specified in section 15–1–1(2) apply. But this case is not a contract action. There was no contract between Anchor Wate

46. *Collier on Bankruptcy, supra* note 30, § 547.03.

47. *Wilcox v. CSX Corp.*, 2003 UT 21, ¶ 26, 70 P.3d 85 (internal quotation marks and brackets omitted).

48. 9B Am.Jur.2d *Bankruptcy* § 1916 (1999).

49. Utah Code Ann. § 15–1–1(2) (2005).

50. *Id.* § 15–1–1.

51. *Id.* § 31A–27–321 (2002).

and the Liquidator and therefore no opportunity for the parties to agree upon an applicable rate of interest. The Liquidator's judgment is not grounded on any voluntary undertaking by Anchor Wate. Rather, it is the result of the statutory power given the Liquidator as he attempts to fulfill his statutory mandate of achieving an equitable distribution of SAIC's estate. And there is nothing to suggest that the default interest rate specified in section 15–1–1(2) is consistent with this statutory mandate.

¶ 45 This court has previously expressed the view that the interest rate specified in section 15–1–1(2) does not necessarily even apply in all contract cases. In *Consolidation Coal Co. v. Utah Division of State Lands & Forestry*,[52] we suggested, albeit in dicta, that we had "serious reservations about ... [cases] that purport[ ] to tie prejudgment interest rates in all contract cases to the section 15–1–1 rate" because this section was meant to apply only to loans or forebearances in contract actions.[53]

¶ 46 Just as the default rate specified in section 15–1–1(2) does not automatically extend to all judgments obtained in contract cases, it does not automatically apply to all judgments based on statute where the legislature has failed to specify the applicable rate. And in this case, we conclude that the more appropriate prejudgment interest rate is the one applicable to preference claims under federal bankruptcy law.

¶ 47 As we have already discussed, when filling in gaps or interpreting ambiguous provisions of the Liquidation Act, we look to the preference provisions of federal bankruptcy law, which have the same purpose as the preference provisions of the Liquidation Act.[54] Therefore, when calculating the prejudgment interest on remand, the district court should use the rate applied by the majority of federal courts to judgments obtained in federal preference actions, which is the federal postjudgment interest rate.[55]

---

**52.** 886 P.2d 514, 525 n. 13 (Utah 1994).

**53.** *Id.* (suggesting that the plain language of section 15–1–1 indicates that the section was intended to apply only to a " 'loan or forbearance' " of " 'money, goods or chose in action' " (quoting Utah Code Ann. § 15–1–1)).

**54.** *Wilcox v. CSX Corp.*, 2003 UT 21, ¶¶ 1, 9, 70 P.3d 85; *see also* Norman J. Singer, *Statutes and Statutory Construction* § 52.01 (6th ed.2002) (indicating that it is appropriate to use similar statutes from other jurisdictions to aid in interpretation).

**55.** *See, e.g., Milchem v. Fredman (In re Nucorp Energy, Inc.)*, 902 F.2d 729, 734 (9th Cir.1990) (applying the rate set forth in 28 U.S.C. § 1961(a)); *Napolitano v. Vibra–Conn, Inc. (In re R.J. Patton Co.)*, 348 B.R. 618, 627 (Bankr. D.Conn.2006) (same); *Great Point Intermodal, LLC v. Norfolk S. Corp. (In re Great Point Intermodal, L.L.C.)*, 334 B.R. 359, 363–64 (Bankr. E.D.Pa.2005) (same); *Gouveia v. RDI Group, Inc. (In re Globe Bldg. Materials, Inc.)*, 325 B.R. 253, 263–64 (Bankr.N.D.Ind.2005) (same); *Official Comm. of Unsecured Creditors of Cyberrebate.com, Inc. v. Gold Force Int'l, Ltd. (In re Cyberrebate.com)*, 296 B.R. 639, 645 (Bankr.E.D.N.Y. 2003) (same); *Kelley v. Chevy Chase Bank (In re Smith)*, 236 B.R. 91, 104 (Bankr.M.D.Ga.1999) (same); *Sucre v. MIC Leasing Corp. (In re Sucre)*, 226 B.R. 340, 350 (Bankr.S.D.N.Y.1998) (same); *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr.S.D.Texas 1997) (same); *Dicello v.*

*Jenkins (In re Int'l Loan Network)*, 160 B.R. 1, 20 (Bankr.D.D.C.1993) (same); *White v. Bradford (In re Tax Reduction Inst.)*, 138 B.R. 325, 326 (Bankr.D.D.C.1991) (same); *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers)*, 135 B.R. 659, 669 (Bankr.D.Colo.1991) (same); *Rieser v. Landis & Gyr Powers, Inc. (In re Bownic Insulation Contractors, Inc.)*, 134 B.R. 261, 267 (Bankr. S.D.Ohio 1991) (same); *Bash v. Schwartz (In re B. Schwartz Furniture Co.)*, 131 B.R. 623, 626 (Bankr.N.D.Ohio 1991) (same); *Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 1006 & n. 21 (Bankr.S.D.Ohio 1990) (same); *Ellenberg v. Mercer (In re Home Co.)*, 108 B.R. 357, 360 (Bankr.N.D.Ga.1989) (same); *Parmelee v. Bank of Greensburg (In re L & T Steel Fab., Inc.)*, 102 B.R. 511, 520–21 n. 9 (Bankr. M.D.La.1989) ("28 U.S.C. § 1961 provides the most appropriate standard for fixing the rate of prejudgment interest upon federal claims...."); *Gilbert v. Suburban Athletic Club (In re Dayton Cir. Cts. No. 2)*, 80 B.R. 434, 440 (Bankr. S.D.Ohio 1987) (same); *Wilson v. First Nat'l Bank (In re Missionary Baptist Found. of Am.)*, 69 B.R. 536, 539 (Bankr.N.D.Tex.1987) ("In the absence of a specific statutory directive ... the Bankruptcy Court should apply the interest provided for in 28 U.S.C. § 1961 both pre- and postjudgment."); *Schwarz v. Equitable Bank (In re Express Litig.)*, 65 B.R. 952, 962 (Bankr.D.Md. 1986) (applying the rate set forth in 28 U.S.C. § 1961); *Crampton v. Dominion Bank of Bristol (In re H.P. King Co.)*, 64 B.R. 487, 491–92 (Bankr.E.D.N.C.1986) (same); *Prod. Steel, Inc. v. Sumitomo Corp. (In re Prod. Steel)*, 60 B.R. 4, 5 (Bankr.M.D.Tenn.1986) (same).

The federal courts have not been unanimous in their selection of the relevant date for the purpose of setting the interest rate.[56] Various courts have set the interest rate from the date of demand,[57] the date of filing,[58] or the date of judgment.[59] While setting the interest rate from one particular day is advantageous in its simplicity, it could arbitrarily create a windfall for either party during the pendency of the action. Consequently, we hold that the most accurate measure of prejudgment interest for judgments obtained pursuant to the voidable preference provisions of the Liquidation Act is the average federal postjudgment interest rate in effect from the date of filing to the date of judgment.[60] Parties can easily calculate the appropriate prejudgment interest rate by adding together the weekly postjudgment interest rates from the date of filing to the date of judgment, which are available at the Federal Reserve's website,[61] and then dividing the total by the number of weeks the action has been pending. Consistent with federal law, the determination of whether the prejudgment interest should be compounded annually lies within the sound discretion of the trial court.

¶ 48 Application of the federal rate will adequately compensate the estates of insolvent insurers for the time value of money without creating an incentive for insurance liquidators to delay prosecution of voidable preference claims in order to obtain returns greater than they could have reasonably expected to earn in the market.[62] It will also more adequately take into account the practical reality of defendants in preference actions that, like Anchor Wate, dispose of the proceeds obtained from the estate of the insolvent insurer in the ordinary course of business prior to the liquidation of the insurer or the initiation of a preference claim by the Liquidator. Such defendants lack the ability to invest the proceeds at all. Under such circumstances, application of the default rate specified in section 15–1–1(2) could be entirely punitive and, in fact, may unjustly enrich other creditors at the expense of the preference defendant. In the event that the Utah legislature prefers a rate of interest different from the federal rate, it may amend

**56.** *Key v. Liquid Energy Corp.*, 906 F.2d 500, 506 (10th Cir.1990) (awarding the plaintiff prejudgment interest using two different rates); *Milchem*, 902 F.2d at 734 (remanding the case to the trial court for consideration of the appropriate prejudgment rate); *Critchlow v. First UNUM Life Ins. Co.*, 377 F.Supp.2d 337, 347–49 (W.D.N.Y. 2005) (awarding prejudgment interest to a judgment for the denial of an insurance claim at the average federal postjudgment interest rate in effect over the period from the initial denial of the plaintiff's claim through the date of entry of judgment); *Prod. Steel, Inc. v. Sumitomo Corp. (In re Prod. Steel, Inc.)*, 60 B.R. 4, 4 (Bankr. M.D.Tenn.1986) (awarding interest at the prevailing rate at the time the action was commenced).

**57.** *See, e.g., Ellenberg*, 108 B.R. at 361 (basing the prejudgment interest rate on the "coupon issue yield equivalent" for the week prior to the date of demand); *Crampton*, 64 B.R. at 492 (setting the interest rate on the date immediately prior to "the date of demand for payment"); *Prod. Steel, Inc.*, 60 B.R. at 4 (citing the district's rule that "the rate of prejudgment interest is equal to the coupon issue yield equivalent ... of the average accepted auction price for the last auction of 52 week U.S. Treasury Bills settled immediately prior to the date of demand.").

**58.** *See, e.g., Great Point Intermodal, LLC*, 334 B.R. at 364 (setting the prejudgment interest rate from the filing date, pursuant to § 1961); *Covey v. Northwest Cmty. Bank (In re Helen Gallagher Enters., Inc.)*, 126 B.R. 997, 1005 (Bankr.C.D.Ill. 1991) (setting the interest rate for the "coupon issue yield equivalent" from the "auction of 54–week [sic] United States Treasury bills" for the period prior to the date of filing); *Wilson*, 69 B.R. at 538–39 (basing the interest rate on the § 1961 auction rate on the date of filing).

**59.** *See Yoder*, 124 B.R. at 1006 ("Such pre-judgment interest shall be computed in accordance with the provisions of § 1961. Pursuant to this provision, the post-judgment interest rate is calculated at a rate equal to the coupon issue yield of a 52–week Treasury Bill set immediately prior to entry of the order.").

**60.** *Critchlow*, 377 F.Supp.2d at 348 (determining the prejudgment interest rate by averaging the weekly § 1961 interest rate from the initial insurance claim denial to the date of judgment).

**61.** *Selected Interest Rates (Weekly)*, Federal Reserve Statistical Release (Federal Reserve website), http://www.federalreserve.gov/releases/h15/.

**62.** *In re F.A.S.I., Inc.*, 48 B.R. 147, 148 (Bankr. D.Conn.1985) (rejecting the application of the state statutory rate of interest in favor of the calculation under federal law "based on prevailing market rate for the time value of money").

the Liquidation Act to specify the applicable rate.

## CONCLUSION

¶ 49 There was no agreement between the reinsurers and SAIC giving Anchor Wate any direct claim to the reinsurance proceeds, and the lack of such an agreement is fatal to all of Anchor Wate's legal theories. We therefore affirm the district court's decision that the Liquidator is entitled to recover the $3.5 million paid to Anchor Wate under the voidable preference provision of the Liquidation Act. We reverse the district court's decision to apply a prejudgment interest rate of 10% per annum to the voidable preference. Rather, the appropriate rate is the one applicable in federal preference actions. We therefore affirm in part, reverse in part, and remand for further proceedings in accordance herewith.

¶ 50 Chief Justice Durham, Justice Durrant, Justice Nehring, and Judge Backlund concur in Justice Parrish's opinion.

¶ 51 Having disqualified himself, Associate Chief Justice Wilkins does not participate herein; District Judge John C. Backlund sat.