TERRI F. LOVE, Judge.
 

 | ¶ This appeal arises from a dispute over insurance coverage relative to alleged Hurricane Katrina damage to a self-storage business. The Plaintiffs sought recovery for lost business development opportunities for thirty-seven future stores for thirty-nine years. The trial court granted several motions for partial summary judgment dismissing the Plaintiffs’ claims against all of the insurance company defendants except for one. However, the trial court denied a motion for partial summary .judgment regarding the insurance coverage provided to the Plaintiffs by Certain Underwriters at Lloyd’s of London because it found that genuine issues of material facts exist as to what coverage the insurance slips provided.
 

 We find that the trial court erroneously issued an amended judgment containing a substantive change and declare the amended judgment an absolute nullity. Further,
 
 *113
 
 we find that the trial court erred by dismissing the Plaintiffs’ claims for lost business opportunities because genuine issues of material fact exist as to the possibility of lost business development opportunities and reverse in part and remand in part for further proceedings consistent with this opinion. However, the trial court correctly interpreted the period of recovery provisions in the insurance policy and properly granted a partial motion for summary judgment on 12said period. Lastly, we find that the trial court correctly denied the motion for partial summary judgment regarding the insurance coverage provided by Certain Underwriters at Lloyd’s of London and deny the writ.
 

 FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 

 Safeguard Storage Properties, L.L.C.
 
 [1]
 
 (“Safeguard”), a self-storage company, partnered with Prime Property Fund (“PPF”), a fund comprised of institutional investors advised by Morgan Stanley Real Estate Advisor, Inc. (“MSREA”). On May 31, 2005; PPF acquired an interest of approximately 93 percent in Safeguard in exchange for $391 million of debt and equity capital. Safeguard alleges that due diligence performed prior to the partnership concluded that Safeguard would develop a minimum of twelve to fifteen new self-storage locations each year. These findings allegedly assisted PPF in its decision to invest $391 million in Safeguard.
 
 [2]
 
 However, Safeguard claims that its proposed developments were curtailed by the devastation of Hurricane Katrina.
 

 Prior to Hurricane Katrina, Safeguard conducted market evaluations on five potential markets: New York City/New Jersey, Philadelphia, South Florida, South Chicago, and Baltimore/Washington, D.C. and pinpointed trade zones, which were two to three square mile areas within the potential markets that exhibit the demographic characteristics and market demand parameters required for a potential site. Safeguard alleges it had nineteen new developments in process when | .¡Hurricane Katrina struck. From August 29, 2005, through the end of that year, Safeguard allegedly had an inventory of forty-seven potential projects in fifty-four trade zones, nine projects in the underwriting stage, and eighteen projects at the letter of intent (“LOI”) or negotiation of contract stage.
 

 Hurricane Katrina damaged Safeguard’s New Orleans area facilities and interrupted the business operations of Safeguard’s corporate office and national call center located at 111 Veterans Memorial Boulevard (“Heritage Plaza”) in Metairie, Louisiana. Heritage Plaza, including Safeguard’s office space, sustained approximately $30 million in dam
 
 *114
 
 ages. Safeguard alleges that it could not reoccupy its space in Heritage Plaza until late November 2005. Subsequently, Safeguard relocated its centralized call center to Chicago, Illinois, and the accounting and management team relocated to a temporary space in Atlanta, Georgia. The damaged Safeguard locations, including Heritage Plaza, were insured under MSREA’s property insurance program with Lexington Insurance Company (“Lexington”) as the primary layer of insurance of $25 million and multiple layers of excess insurance.
 

 Safeguard filed a petition for declaratory judgment and damages against Donahue Favret Contractors, Inc. (“Donahue”), Mapp Construction, L.L.C. (“Mapp”), and all of the insurers of Safeguard and Mapp
 
 [3]
 
 seeking monetary damages against companies contracted to repair Safeguard’s properties, payments on policies from its excess insurers due to Hurricane Katrina damages, and penalties and attorneys’ fees pursuant to La. R.S. 22:658 and La. R.S. 22.T220.
 
 [4]
 
 Safeguard also sought monetary damages for lost business opportunities for the business locations Safeguard was allegedly unable to open due to Hurricane |4Katrina from Lexington and its excess insurers,
 
 [5]
 
 (collectively referred to as “Defendant Insurers”). Safeguard’s claims against Donahue, Mapp, and their insurers were stayed.
 

 The Defendant Insurers’ filed motions for partial summary judgment asserting that Safeguard’s lost business opportunities claims for forty years of profits from thirty-six stores that would have allegedly been built but for Hurricane Katrina were too speculative as a matter of law, that Safeguard could only recover damages sustained during the applicable period of recovery, and regarding the application of the period of recovery.
 
 [6]
 
 Safeguard subsequently filed a motion for partial summary judgment asserting that its claims for lost business developments and development income streams were covered by insurance. Numerous oppositions and cross-motions for partial summary judgment to the various motions for partial summary judgment followed.
 

 Lloyd’s filed a motion for partial summary judgment asserting that the “policy wording” controls the rights and obligations of it and Safeguard. Safeguard filed a motion for partial summary judg
 
 *115
 
 ment regarding the “nature and effect” of Lloyd’s coverage slips (“Slips”).
 
 [7]
 
 Subsequent oppositions and cross-motions were filed.
 

 laFollowing a hearing on the multiple motions for partial summary judgment between Safeguard and the Defendant Insurers, the trial court granted the Defendant Insurers’ motion for partial summary judgment as to lost business opportunities because Safeguard’s claims were too “speculative” and cross-motion for partial summary judgment on Safeguard’s lost business opportunity claim. The trial court then denied Safeguard’s re-urged motion for partial summary judgment regarding business interruption coverage for loss of development. The trial court also granted the Defendant Insurers’ motion for partial summary judgment regarding the period of recovery and denied Safeguard’s corresponding re-urged motion. Finally, the trial court declared moot the following motions for partial summary judgment: Defendant Insurers’ motion for partial summary judgment on causation for lost development opportunities due to direct loss damage or destruction to insured property for which damage the Defendant Insurers have accepted coverage; motion for partial summary judgment on Safeguard’s burden of proof on its business interruption claim; motion for partial summary judgment on Safeguard’s lost business opportunities based on mold exclusions, and Safeguard’s motion for partial summary judgment regarding the burden of proof under the all risks insurance policies issued by the Defendant Insurers. Safeguard appealed.
 
 [8]
 

 The trial court then issued an amended judgment excluding Lloyd’s from the Defendant Insurers referred to in the original judgment because it mistakenly used the noun “defendant” without specificity. The trial court stated that Lloyd’s “did not formally acknowledge and/or adopt the insurance contract which is the subject | fiof this litigation”
 
 [9]
 
 and that whether or not Lloyd’s would be included in the results of the original judgment depended upon the trial court’s “ruling on the slip/binder issue.” Lloyd’s filed an assignment of errors contained in the amended judgment, which included that the trial court was divested of jurisdiction to issue the amended judgment, La. C.C.P. art. 1951 does not permit substantive changes in an amended judgment, and that the Slips versus manuscript issue was not material to the disposed of motions. Lloyd’s and Safeguard both filed motions for devolutive appeals from the amended judgment.
 
 [10]
 

 Safeguard asserts that the trial court erred for the following five reasons: 1) by granting the Defendant Insurers’ partial motions for summary judgment finding that recovery for lost business opportunities was not available, 2) by granting the Defendant Insurers’ partial motion for summary judgment regarding the period of recovery, 3) by declaring Safeguard’s partial motion for summary judgment as to the burden of proof moot, 4) by excluding additional evidence, and 5) that if this Court vacates the trial court’s amended
 
 *116
 
 judgment, then the trial court erred by granting the partial motions for summary judgment as to all of insurers because Lloyd’s should be excluded.
 

 Lloyd’s asserts that the trial court erred by amending the original judgment because La. C.C.P. art. 2088 divested the jurisdiction of the trial court, by making substantive changes to the original judgment in violation of La. C.C.P. art. 1951, and because the insurance Slips were not material to the motions disposed of by the judgment.
 

 Safeguard and Lloyd’s filed a motion for summary judgment and crossjmotion7 for summary judgment, respectively, regarding Safeguard’s and Lloyd’s intended meaning of business interruption coverage in the Marsh Manuscript Form and the Slips. The trial court denied both motions for summary judgment because the parties’ intent was unclear from the binder and no formal insurance policy was issued. Given the trial court’s previous ruling that Lloyd’s issued Slips and not a formal insurance contract, the trial court stated that
 

 questions of fact exist as to who drafted the binder. Also, whether gross earnings has an ordinary meaning or a technical one would depend upon facts adduced from the experts. At the very least, it would depend upon the credibility of the experts which should be weighed by the trier of facts. Further, this Court believes that the central issue posed by the litigants does not lend itself to resolution by a motion for partial summary judgment. The central issue is: “What was contemplated by the parties” when the’ binders were negotiated?
 

 Lloyd’s devolutive appeal followed.
 
 [11]
 

 Lloyd’s asserts that the trial court committed the following six errors: 1) by proceeding with the January 19, 2010 hearing because the previous trial court’s ruling rendered the cross-motions for summary judgment moot; 2) by failing to find that Morgan Stanley and Lloyd’s intended that the Marsh Manuscript Form, as amended, was controlling; 3) by failing to find that the Marsh Manuscript Form governed the contractual relationáhip between Safeguard and Lloyd’s; 4) by finding that genuine issues of material fact exist as to being bound only by the Slips and not the Marsh Manuscript Form; 5) by failing to render in Lloyd’s favor as to the policy because Safeguard did not offer any factual evidence to contradict Lloyd’s position; and 6) by finding that genuine issues of material fact exist as to |Rwho drafted the Slips and the meaning of the terms contained in the Slips.
 

 AMENDED JUDGMENT
 

 Lloyd’s asserts that the trial court was divested of jurisdiction, pursuant to La. C.C.P. art. 2088, once the original judgment was issued and was thereby prohibited from issuing the amended judgment, which constitutes an absolute nullity. La. C.C.P. art. 2088 provides:
 

 A. The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the
 
 *117
 
 case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to:
 

 (1) Allow the taking of a deposition, as provided in article 1433;
 

 (2) Extend the return day of the appeal, as provided in Article 2125;
 

 (3) Make, or permit the making of, a written narrative of the facts of the case, as provided in Article 2131;
 

 (4) Correct any misstatement, irregularity, informality, or omission of the trial record, as provided in Article 2132;
 

 (5) Test the solvency of the surety on the appeal bond as of the date of its filing or subsequently, consider objections to the form, substance, and sufficiency of the appeal bond, and permit the curing thereof, as provided in Articles 5123, 5124, and 5126;
 

 (6) Grant an appeal to another party;
 

 (7) Execute or give effect to the judgment when its execution or effect is not suspended by the appeal;
 

 (8) Enter orders permitting the deposit of sums of money within the meaning of Article 4658 of this Code;
 

 (9) Impose the penalties provided by Article 2126, or dismiss the appeal, when the appellant fails to timely pay the estimated costs or the difference between the estimated costs and the actual costs of the appeal; or
 

 (10) Set and tax costs and expert witness fees.
 

 B. In the case of a suspensive appeal, when the appeal bond is not timely filed and the suspensive appeal is thereby not perfected, the trial court maintains jurisdiction to convert the suspensive appeal to a devolutive appeal, except in an eviction case.
 

 19However, La. C.C.P. art. 1951 permits the trial court to amend a final judgment at any time “[t]o alter the phraseology of the judgment, but not the substance; or ... [t]o correct errors of calculation.” “[A] judgment may be amended by the court only if the amendment takes nothing from or adds nothing to the original judgment.”
 
 Paragon Lofts Condo. Owners Ass’n, Inc. v. Paragon Lofts, L.L.C.,
 
 10-0419, p. 1 (La.App. 4 Cir. 1/14/11), 55 So.3d 970, 972. “[W]hen an amendment to a judgment adds to, subtracts from, or in any way affects the substance of the judgment, such judgment may not be amended under LSA-C.C.P. art. 1951.”
 
 Preston Oil Co. v. Transcon. Gas Pipe Line Carp.,
 
 594 So.2d 908, 911 (La.App. 1st Cir.1991). The trial court may change the substance of the original judgment in three ways: “1) the timely motion for new trial; 2) timely appeal; or 3) petition or action for nullity.”
 
 Paragon,
 
 10-0419, p. 1, 55 So.3d 970, 972.
 

 This Court concluded that a trial court was prohibited from issuing an amended judgment because jurisdiction was divested once an order of appeal was granted.
 
 Harvey v. Traylor,
 
 96-1321 (La.App. 4 Cir.2/5/97), 688 So.2d 1324, 1329. “Furthermore, changing the name of a party cast in judgment is a substantive change prohibited by Code of Civil Procedure article 1951.”
 
 Id.
 
 This Court also held that the addition of a party to a judgment in an amended judgment constituted an absolute nullity.
 
 Paragon,
 
 10-0419, p. 1, 55 So.3d 970, 972.
 

 The trial court stated that “it clearly erred in phraseology when it simply used the collective nouns to refer to plaintiffs and defendants without naming what specific entities comprised the plaintiff group and the defendant group” and used
 
 Wagenvoord Broad. Co. v. Blanchard,
 
 261
 
 *118
 
 So.2d 257 (La.App. 4th Cir.1972) for | ipsupport. However,
 
 Wagenvoord
 
 dealt with the misspelling of a name, not defining which parties prevailed on a motion for partial summary judgment. 261 So.2d at 259.
 

 In the case
 
 sub judice,
 
 the trial court judge amended the original judgment to exclude Lloyd’s from the granting of the motions for partial summary judgment. Meaning, Lloyd’s originally prevailed on the motions for partial summary judgment, but after the amended judgment, Lloyd’s was excluded from the prevailing class of Defendant Insurers. Thus, given the statutory divestiture of jurisdiction coupled with the jurisprudential interpretation of La. C.C.P. art. 1951, we find that the change excluding Lloyd’s from the “defendants” was substantive. Therefore, we declare that the amended judgment is an absolute nullity.
 

 STANDARD OF REVIEW
 

 Motions for summary judgment are reviewed with the
 
 de novo
 
 standard of review utilizing the same criteria as the trial court.
 
 Manichia v. Mahoney,
 
 10-0087, p. 4 (La.App. 4 Cir.8/4/10), 45 So.Sd 618, 620. “The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action” and “is favored and shall be construed to accomplish these ends.” La. C.C.P. art. 966(A)(2). “[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law” then a motion for summary judgment will be granted. La. C.C.P. art. 966(B). The burden of proof remains with the mover. La. C.C.P. art. 966(C)(2).
 

 However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on|uthe motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense.
 

 La. C.C.P. art. 966(C)(2). The adverse party must “produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial” or there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).
 

 “As this court has explained, a ‘genuine issue’ is a ‘triable issue,’ or one as to which reasonable persons could disagree.”
 
 Hogg v. Chevron USA, Inc.,
 
 09-2632, p. 6 (La.7/6/10), 45 So.3d 991, 997,
 
 quoting Champagne v. Ward,
 
 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 777. A fact is material when “the existence or non-existence of which may be essential to a cause of action under the applicable theory of recovery.”
 
 Id.
 

 LOST BUSINESS OPPORTUNITIES
 

 The trial court stated that Safeguard’s claim for lost business opportunities consisted of “speculation” and was not “actual loss sustained.” Safeguard avers that the trial court erred by granting the Defendant Insurers’ motion for partial summary judgment asserting that Safeguard’s claim for lost business opportunities was too speculative as a matter of law. This assertion presents a
 
 res nova
 
 issue for this Court because Safeguard seeks insurance coverage for thirty-seven self-storage facilities that it would have allegedly built and thirty-nine years of operation of said facilities. The Defendant Insurers contend that Safeguard focuses on the contractual provisions on appeal rather than the claim
 
 *119
 
 being too speculative as a matter of law. We address both approaches to Safeguard’s claim for lost business opportunities below.
 

 112Contractual Interpretation
 

 The interpretation of contracts is governed by statutes. “A contract is formed by the consent of the parties established through offer and acceptance.” La. C.C. art. 1927. “An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer.” La. C.C. art. 1943. “Whether or not a contract is ambiguous is a question of law.”
 
 Pope v. Khalaileh,
 
 05-0027, p. 5 (La.App. 4 Cir. 6/1/05), 905 So.2d 1149, 1152.
 

 “When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” La. C.C. art. 2046. If doubt exists and “cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text,” or, if in standard form, it must be interpreted “in favor of the other party.” La. C.C. art. 2056. “A doubtful provision must” also “be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.” La. C.C. art. 2053. “Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.”
 
 Bonin v. Westport Ins. Corp.,
 
 05-0886, p. 5, (La.5/17/06), 930 So.2d 906, 910.
 

 The insurance contract contained the following pertinent language:
 

 B. Business Interruption
 

 (1) Loss resulting from necessary interruption of business conducted by the Insured, caused by direct physical loss, damage, or destruction by any of the perils covered herein diming the term of this policy to real or personal property as described in Clause 7.A. and subject to the Company’s acceptance of coverage for the Damage. 11S(2) If such loss occurs during the term of this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED by the Insured directly resulting from such interruption of business, consisting of the net profit which is thereby prevented from being earned and all charges and expenses only to the extent that these must necessarily continue during the interruption of business and only to the extent to which such charges and expenses would have been earned had no loss occurred.
 

 (Emphasis added). The following provision provided that the experience of the business would be determined in the following manner:
 

 (5) Experience of the Business
 

 (a) In determining the amount of net profit, charges, and expenses covered hereunder for the purposes of ascertaining the amount of loss sustained, due consideration shall be given to the experience of the business before the date of damage or destruction and to the probable experience therefore had no loss occurred.
 

 Thus, the actual loss sustained could include Safeguard’s claim for lost business opportunities if it proved that it suffered an actual loss from the opportunities, as defined in the above provision, within the two limited periods of recovery as outlined below. We cannot determine as a matter of law that a portion of Safeguard’s claims for lost business opportunities was not covered by the Defendant Insurers. Therefore, we find that the trial court erred as a
 
 *120
 
 matter of law in finding that Safeguard’s alleged business opportunities consisted of speculation and not as possible proof of actual loss sustained.
 

 Alleged Speculative Evidence
 

 Defendant Insurers bore the burden of proving that no genuine issues of material fact existed as to Safeguard’s claim for lost business opportunities. They assert that Safeguard “never earned a net profit for any year, and had a ‘poor’ track 114record of meeting projected start dates for new developments.” In support of their contention, they cite cases regarding speculative evidence of lost earnings. However, the majority of the cases cited were post-trial, which presents a different procedural posture from the case
 
 sub judice
 
 because those plaintiffs presented evidence of lost earnings wherein the fact finder concluded that the evidence submitted was insufficient. We find that the Defendant Insurers failed to carry their burden of proof on summary judgment and reverse.
 

 “A ‘projection’ of earnings is an accepted method of calculating business interruption loss.”
 
 Cotton Bros. Baking Co., Inc. v. Indus. Risk Insurers,
 
 774 F.Supp. 1009, 1028 (W.D.La.1989). “Our courts have held that although awards may not be based on speculation or conjecture, nonethéless, lost profits are recoverable when proven with reasonable certainty.”
 
 Ellwest Stereo Theatres, Inc. v. Davilla,
 
 436 So.2d 1285, 1288 (La.App. 4th Cir. 1983). “Customary or foreseeable profit may be resorted to as a measure of damage where there is no direct evidence of the exact extent of loss.”
 
 Id.
 
 “A claim for loss of profits will not be supported by mere estimates of loss.”
 
 Wasco, Inc. v. Econ. Dev. Unit, Inc.,
 
 461 So.2d 1055, 1057 (La.App. 4th Cir.1984). “Although the absence of independent corroborative evidence is not always fatal, the lack of even a minimal degree of detail and specificity in the plaintiffs testimony, regarding the issue of lost profits, would preclude recovery of this item of damages.”
 
 Id.
 

 Safeguard states that it developed thirty-eight new storage facilities from 2001 to May 31, 2005. Safeguard contends that it sustained lost business opportunity income due to its alleged inability to build thirty-seven new storage facilities and should receive insurance proceeds as do plaintiffs for future lost wages. Safeguard presented market research conducted into the development of hBthe thirty-seven future storage facilities as well as financial reports and expert opinions.
 

 J. Stuart Wood, a Safeguard expert, stated in his deposition that Safeguard was in a “much worse position” than if the damage from Hurricane Katrina did not happen. Mr. Wood posited that a conservative estimate for Safeguard’s lost business opportunities was $332,500,000 in net income. Safeguard also presented the expert reports of Bert Verdigets to substantiate the loss of business opportunities. Mr. Verdigets’ estimated that Safeguard’s lost business opportunity claim valued $276,764,519 or $308,559,000, when utilizing the net cash flow basis or gross cash flow basis, respectively. Mr. Verdigets stated in his deposition that he would not state that a certain number of developments were lost due to Hurricane Katrina. Further, he stated, “I don’t think there’s anybody besides God that could tell you but for Katrina this development was missed at this location.” The Defendant Insurers contend that Mr. Verdigets’ estimate of Safeguard’s lost business opportunities would place Safeguard in a better financial position than if Hurricane Katrina never occurred. However, the determination of whether to agree with Mr. Verdigets’ estimates is a credibility determination for the finder of fact, as well as
 
 *121
 
 the determination of how much, if any, money to award for lost business opportunities that are found to have occurred during the two periods of recovery.
 

 The Defendant Insurers presented evidence intended to prove that no genuine issues of material fact exist regarding Safeguard’s claim for lost business opportunities because the alleged future stores did not have specific addresses and the loss was, therefore, too speculative. However, attacking the credibility of Safeguard’s expert reports regarding the loss of business opportunities and determining the monetary amount of lost business opportunities, which is an | ^intensely factual determination, are suitable issues for a trial on the merits.
 

 This Court does not contend that Safeguard will succeed on its claim, nor do we find that Safeguard is entitled to recover allegedly lost revenues for thirty-nine years. However, when viewing the evidence in the light most favorable to Safeguard, we find that genuine issues of material fact exist as to whether Safeguard incurred a loss of business opportunities during the two • applicable recovery periods. Therefore, the trial court erred in granting the Defendant Insurers’ motion for partial summary judgment and we reverse and remand for further proceedings.
 

 PERIOD OF RECOVERY
 

 Safeguard contends that the trial court erred in granting the Defendant Insurers’ partial motion for summary judgment regarding the applicable period of recovery. Safeguard further avers that “[t]he construction adopted renders portions of the wording without meaning and ignores the grammatical structure of the provision.”
 

 The trial court stated in its reasons for judgment that
 

 All parties agree that, under the Period of Recovery clause, the losses that Safeguard may recover under the policy are limited to those incurred during the two defined time periods, the Initial Period and the Extended Period. Therefore, the only task before the Court is to construe the policy so as to define the beginning and ending of these two periods.
 

 All parties also agree that the Period of Recovery clause is clear and unambiguous. The Court agrees. The Court finds that the Initial Period begins at the time of loss and ends when the damaged insured properties could have been repaired, replaced, or rebuilt if done with diligence and dispatch, or when the business reopens. Obviously, the Initial Period is meant to protect the insured from its loss income while it repairs its damaged property. Similarly, the Extended Period begins when the damaged properties are actually repaired (or when the |17insurers’ liability for repairs would otherwise end) and ends when the business returns to pre-loss conditions, but in all events no more than one year in total. Plainly, this Extended Period protects the insured for a limited period of time after it restores its damaged property and needs to bring its business back up to pre-loss conditions.
 

 Safeguard contends it was covered by both the Initial Period and the Extended Period simultaneously until it actually repaired or replaced its damaged property (which it argues was the date it relocated its headquarters to Atlanta permanently in November 2006, and thereafter continues to be covered by the Extended Period until the applicable prescriptive period expires (which it argues will be ten years after the loss, or August 29, 2015), and further for an additional year thereafter, through August 29, 2016. Safeguard’s claim then,
 
 *122
 
 is that it should receive “business interruption” recovery for more than a decade after its business was interrupted. The Court finds Safeguard’s view to be a strained interpretation of the policies. It is not consistent with the “clear and unambiguous” language of the policies.
 

 In light of the foregoing, Defendant Insurers’ Motion for Partial Summary Judgment on Application of the Period of Recovery is GRANTED. The Plaintiffs Re-urged Motion for Partial Summary Judgment Regarding Period of Recovery for Business Interruption Losses is DENIED.
 

 The applicable provision states:
 

 E. Provisions Applicable to Business Interruption, Extra Expense, and Rental Value
 

 (1) Period of Recovery: The length of time for which loss may be claimed:
 

 (a) shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as had been destroyed or damaged;
 

 (b) and, such additional length of time to restore the Insured’s business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:
 

 i. the date on which the liability of the Insurer for loss or damage would otherwise terminate; or
 

 ii. the date on which repair, replacement, or rebuilding of such | isPart of the property as has been damaged is actually completed; but in no event for more than one year thereafter from said later commencement date;
 

 iii. with respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly, shall be determined as provided in (a) above, but such determined length of time shall be applied to the experience of the business after the business has reached its planned level of production or level of business operation;
 

 iv.and shall commence with the date of such loss or damage and shall not be limited by the date of expiration of this policy.
 

 Safeguard asserts that the initial period extended from the date of Hurricane Katrina until the Atlanta office space was “back to steady state operations” in September 2007. The Defendant Insurers contend that the initial period ended when Safeguard returned to the damaged office space in Heritage Plaza.
 

 As to the extended period, Safeguard interprets the language to mean that the extended period begins on the date of Hurricane Katrina and extends to “ ‘such additional period of time to restore the insured’s business to the condition that would have existed had no loss occurred’ which period ‘shall not be limited by the date of the expiration of the policy.’ ” Under this interpretation, Safeguard states that the extended period extends to “at least as long as the damage period claimed by Safeguard here, which is through April 2009.”
 

 We find that the contractual provisions are clear and unambiguous. The initial period of recovery begins at the time of loss and ends when the damaged insured properties could have been repaired, replaced, or rebuilt if done with | ^diligence and dispatch, or when the business reopens. The extended period begins when the damaged properties are actually repaired (or when the insurers’ liability for repairs would otherwise end) and ends when the business returns to pre-loss con
 
 *123
 
 ditions, but in all events no more than one year in total. Interpreting the contractual clause regarding the period of recovery to include coverage through 2016 would give the contractual language an absurd meaning with absurd consequences, which is in contravention of Louisiana statutory contractual interpretation. However, we find that the actual dates upon which the initial period of recovery concluded and when the extended period of recovery began are questions of fact to be determined at trial.
 
 [12]
 
 Accordingly, we do not find that the trial court erred in granting the Defendant Insurers’ partial motion for summary judgment, which asserted that Safeguard’s business interruption insurance would cover the initial time needed to repair the property damage with due diligence and dispatch and a separate extended period of no more than one year.
 

 Because we declared the amended judgment an absolute nullity and found that genuine issues of material fact exist as to Safeguard’s claims for lost business opportunities, we pretermit the discussion of the remainder of Safeguard’s assignments of error.
 

 LLOYD’S DISPUTED COVERAGE THROUGH SLIPS
 

 In the consolidated appeal, Lloyd’s asserts that the Slips are subject to the Marsh Manuscript Form
 
 [13]
 
 by language and reference, that no genuine issues of material fact exist as to the fact that it and Safeguard contemplated being bound by 12nthe Marsh Manuscript Form, and various other assignments of error regarding whether the trial court properly denied its motion for partial summary judgment.
 

 La. C.C.P. art. 1915 Certification
 

 As mentioned in the previous footnote, Lloyd’s motion for devolutive appeal sought to appeal an interlocutory judgment. Although the trial court certified the judgment denying Lloyd’s motion for partial summary judgment as final and appealable pursuant to La. C.C.P. art. 1915(B)(1), the denial of a summary judgment cannot be certified as final and ap-pealable.
 
 Yokum,
 
 07-0676, p. 6, 981 So.2d at 730. Therefore, the judgment Lloyd’s seeks to reverse remains interlocutory, which is subject to this Court’s supervisory jurisdiction. This Court is not time-barred from converting Lloyd’s appeal into an application for supervisory writ if the motion for devolutive appeal was filed within thirty days of the notice of judgment. See Rule 4-3, Uniform Rules, Courts of Appeal.
 

 The judgment was rendered on February 18, 2010. The notice of signing of judgment was mailed on February 19, 2010, which was a Friday. The date of the act, i.e., the mailing of the notice of judgment, does not begin the time period computation for a time delay. La. C.C.P. art. 5059. Saturday and Sunday, February 19-20, 2010, were legal holidays and also did not start the computation of the time delay. La. R.S. 1:55. Accordingly, the thirty-day time period began to run on Monday, February 22, 2010. The thirty-day time period ended on March 23, 2010. However, Lloyd’s filed the motion for de-volutive appeal on March 26, 2010. Therefore, Lloyd’s motion for devolutive appeal
 
 *124
 
 was not filed within the time period for filing an application for supervisory writ.
 

 However, Rule 4-3 of the Uniform Rules, Courts of Appeal, states that “[a]n application not filed in the appellate court within the time so fixed or extended _j2ishall not be considered, in the absence of a showing that the delay in filing was not due to the applicant’s fault.” While case law exists establishing that a denial of a summary judgment cannot be certified as final and appealable, Lloyd’s relied upon the trial court judge, who certified the judgment as final and appealable and granted the motion for devolutive appeal, which was filed within the proper time period for a devolutive appeal. Therefore, we exercise our discretion and convert Lloyd’s appeal into an application for supervisory review.
 

 Merits
 

 The trial court stated that
 

 this Court finds that the questions involved are
 
 not
 
 simply questions of law. For instance, questions of fact exist as to who drafted the binder. Also, whether gross earnings has an ordinary meaning or a technical one would depend upon facts adduced from the experts. At the very least, it would depend upon the credibility of the experts which should be weighed by the trier of facts. Further, this Court believes that the central issue posed by the litigants does not lend itself to resolution by a motion for partial summary judgment. The central issue is: “What was contemplated by the parties” when the binders were negotiated?
 

 This question, necessarily, invokes the issue of intent. This Court is mindful that a summary judgment is a favored procedural device. However, summary judgment is only warranted when reasonable minds must
 
 inevitably
 
 conclude that mover is entitled to judgment as a matter of law. Further, the mover for summary judgment must show that it is quite clear what truth is and exclude any real doubt as to existence of material fact.
 
 Nancy Waller, wife of and Patrick Dempsey v. Automotive Casualty Ins., et al,
 
 680 So.2d 675 (La.App. 1st Cir.1996). (Emphasis added). When “intent” is the focal issue, rarely can one determine through a summary judgment, quite clearly what truth is. This difficulty is enhanced when the court tries to fathom intent with an ambiguous binder and an unissued policy.
 

 (footnote omitted). The trial court also stated that “there are some serious questions about what time frame applies to the binder.” We agree.
 

 | ^Lloyd’s did not issue a formal insurance policy. However, Lloyd’s did have the Slips, the American equivalent of an insurance binder. Louisiana provides that “[a] ‘binder’ is used to bind insurance temporarily pending the issuance of the policy.” La. R.S. 22:870. “Although the cover note or binder is sufficient to evidence a contract, it does not stand independent from the policy.”
 
 Donaldson v. United Cmty. Ins. Co.,
 
 98-1187, p. 11 (La.App. 3 Cir.2/10/99), 741 So.2d 676, 683. Louisiana jurisprudence provides that “[t]he effect given to a binder is always a question of intent of the parties.”
 
 Id.
 

 “Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature.” La. C.C. art. 1848. However, “[p]arol evidence is admissible to show that a written agreement was incomplete and not intended by the parties to exhibit the entire agreement.”
 
 United Investors Life Ins. Co. v. Alexander,
 
 27,466, p. 3 (La.App. 2 Cir.
 
 11/1/95),
 
 662 So.2d 831, 833. “[I]t is equally well established that testimonial evidence may
 
 *125
 
 be admitted to show that the written agreement was incomplete and was not intended by the parties to exhibit the entire agreement.”
 
 Guilbeau v. C & D Reprographics-Lafayette, Inc.,
 
 568 So.2d 206, 211 (La.App. 3rd Cir.1990).
 

 As mentioned above, a binder is not a complete stand-alone contract and determining the parties’ intent is a necessary component of interpreting a binder. The record reflects that the two Marsh U.S. representatives did not agree to a final policy wording sent by Beazley Management Limited (“Beazley”), acting as Lloyd’s lead underwriter. Thus, again, a final policy with finalized policy wording was never issued.
 

 Lloyd’s contends that the Slips alone govern and that the parties clearly intended that the Marsh Manuscript Form be incorporated by reference. However, | ^Safeguard contends that Lloyd’s assertion that usage of the term “wordings” refers to the Marsh Manuscript Form is misplaced because it actually refers “to an anticipated formal policy that Underwriters never issued.” Safeguard also avers that once the Slips were “scratched” by the underwriters, the negotiation phase began. Amanda Good, a wordings manager for Beazley, stated in her deposition that she could not say that there was a final agreement to the wordings between Marsh and Beazley.
 

 Therefore, like the trial court, we find that the interpretation of the Slips and the parties’ intent is not clearly discernable, which presents factual questions suitable for the trier of fact after weighing the credibility of the evidence and testimony presented at trial.
 
 [14]
 
 Thus, we find that genuine issues of material fact exist as to whether the parties intended to be bound by the proposed policy language and Marsh Manuscript Form after Beazley’s second round of changes and deny the writ.
 

 DECREE
 

 Accordingly, for the aforementioned reasons, we declare the amended judgment an absolute nullity due to the substantive change. We further find that the trial court erroneously granted the Defendant Insurers’ motion for partial summary judgment relative to lost business opportunities and reverse and remand. However, the trial court properly granted the Defendant Insurers’ motion for partial summary judgment regarding the applicable period of recovery. Lastly, we find that the trial court did not err in denying Lloyd’s motion for partial summary judgment regarding whether the language contained in the Slips govern [^Safeguard’s coverage and deny the writ.
 

 WRIT DENIED; AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 

 [1]
 

 . Safeguard Storage Properties, L.L.C. (“Safeguard”) also refers to the following plaintiffs unless specificity is required: Safeguard Capital Fund, L.P.; Safeguard Carroll-wood, L.P.; Safeguard E. Williamsburg, L.L.C.; Safeguard Fifteen, L.L.C.; Safeguard FL I, L.L.C.; Safeguard Fourteen Partners; Safeguard GP, L.L.C.; Safeguard GP II, L.L.C.; Safeguard GP III, L.L.C.; Safeguard GP IV, L.L.C.; Safeguard GP V, L.L.C.; Safeguard Hollis, L.L.C.; Safeguard Illinois I, L.P.; Safeguard Mountainside, L.P.; Safeguard N.Y. I, L.L.C.; Safeguard N.Y. II, L.L.C.; Safeguard Operations, L.L.C.; Safeguard PA I, L.L.C.; Safeguard PA II, L.L.C.; Safeguard Properties, L.L.C.; Safeguard Properties II, L.L.C.; Safeguard Properties III, L.L.C.; Safeguard Thirteen Partners; Safeguard TRS, L.L.C.; Safeguard Wabash, L.P.; SDG Palm Harbor Holding, L.L.C.; ■ Sixteen Front Parcel, L.L.C.; Sixteen Rear Parcel, L.L.C.; and Stewart Storage Holding, L.L.C.
 

 [2]
 

 . Safeguard alleges that the development strategy of twelve to fifteen new locations a year was consistent with past practice.
 

 [3]
 

 . Liberty International Underwriters, and Bituminous Insurance Company ("Bituminous”)as insurers of Mapp.
 

 [4]
 

 . The statutes are now numbered La. R.S. 22:1892 and La. R.S. 22:1973, respectively.
 

 [5]
 

 . Ace American Insurance Company ("Ace”), Allied World Assurance Company ("Allied”), American International Specialty Lines Insurance Company ("AISLIC”), Axis Reinsurance Company ("Axis”), Axis Specialty Limited ("ASL”), Certain Underwriters at Lloyd’s of London ("Lloyd’s”), Continental Casualty Company ("Continental”), Federal Insurance Company ("Federal”), Great Lakes UK d/b/a Great Lakes Reinsurance (UK), PLC ("Great Lakes”), Illinois Union Insurance Company ("Illinois”), International Insurance Company of Hannover ("International”), Liberty Mutual Group ("LMG”), Employers Insurance Company of Wausau ("Employers”), Pacific Insurance Company, Ltd. ("Pacific”), SR International Business Insurance Company, Ltd. ("SR”), and XL Insurance America, Inc. ("XL”).
 

 [6]
 

 .The Defendant Insurers also filed motions for partial summary judgment regarding Safeguard’s burden of proof for the business interruption claim, the causation of claims for lost business opportunities due to direct loss, and Safeguard’s lost business opportunities based on mold exclusions. Safeguard also filed a motion for partial summary judgment against Lexington regarding an alleged bad faith adjustment. Numerous exceptions were also filed by the Defendant Insurers. However, none of the above mentioned documents form the basis of the appeal.
 

 [7]
 

 . Slips are the European equivalent of the American usage of an insurance binder.
 

 [8]
 

 . The trial court designated the original interlocutory judgment as final and appealable pursuant to La. C.C.P. art. 1915(B)(1).
 

 [9]
 

 . Safeguard filed an opposed motion to amend the judgment to correct a clerical error contained in the original judgment after appealing the original judgment. However, the trial court disregarded the motion and issued the amended judgment
 
 ex proprio motu.
 

 [10]
 

 .The trial court designated the amended interlocutory judgment as final and appeal-able pursuant to La. C.C.P. art. 1915(B)(1).
 

 [11]
 

 . The trial court designated the original interlocutory judgment as final and appealable pursuant to La. C.C.P. art. 1915(B)(1). However, this Court notes a procedural error, as the denial of a motion for summary judgment is not appealable even if certified as final by the trial court judge.
 
 Yokum v. Van Calsem,
 
 07-0676, p. 6 (La.App. 4 Cir.3/26/08), 981 So.2d 725, 730. Therefore, the judgment Lloyd’s seeks to reverse remains interlocutory, which is subject to this Court’s supervisory jurisdiction.
 

 [12]
 

 . The trial court, in granting the partial motion for summary judgment did not determine a timeline for the initial or extended periods.
 

 [13]
 

 . The proposed form circulated between MSREA and its broker, Marsh US, for 2004 renewal submissions. Marsh presented the Marsh Manuscript Form to Beazley Management Limited, as Lloyd’s lead underwriter. Marsh UK acted on MSREA’s behalf with Lloyd’s, as it was an authorized Lloyd’s broker in London.
 

 [14]
 

 . The trier of fact, while discerning the intent of the parties, will determine what time frame the parties intended and how the parties intended to utilize the term "gross earnings” after weighing the testimony presented at trial.